COMMONWEALTH TITLE COMPANY
OF PHILADELPHIA

v.

Walter J. ROTHENSIES, former Collector of Internal Revenue, First District of Pennsylvania, Joseph F. J. Mayer, former Acting Collector of Internal Revenue, First District of Pennsylvania, and Francis R. Smith, Collector of Internal Revenue, First District of Pennsylvania.

CENTRAL–PENN NATIONAL BANK
OF PHILADELPHIA

v.

Joseph F. J. MAYER, former Acting Collector of Internal Revenue, First District of Pennsylvania, and Francis R. Smith, Collector of Internal Revenue, First District of Pennsylvania.

Civ. A. No. 11819, 11820.

United States District Court
E. D. Pennsylvania.

Aug. 6, 1954.

Wolf, Block, Schorr & Solis-Cohen, MacCoy, Evans & Lewis, Philadelphia, Pa., for plaintiffs.

W. Wilson White, U. S. Atty., Norman Kron, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

GANEY, District Judge.

In the first action, Commonwealth Title Company of Philadelphia ("New Commonwealth") seeks to recover amounts totaling $762,891.03[1] plus interest representing income and excess profits taxes alleged to have been erroneously paid by it for the period April 1 to December 31, 1944, and for the calendar year 1945 and 1946. In the second action Central-Penn National Bank of Philadelphia ("Central-Penn") seeks recovery of $118,689.67[2] paid by it for the year 1944. Since the issues posed arise out of the "consolidation and merger" of the same title insurance companies, the actions were tried together. The issues are five in number and they are, stated broadly, as follows:

1. Was New Commonwealth entitled to the carry over unused excess profits credits and carry over losses of Old Commonwealth for 1942, 1943 and for the period January 1 to March 31, 1944, under the provisions of § 710(c) (3) and § 122(b) (2) (A) of the Internal Revenue Code, 26 U.S.C.A. §§ 710(c) (3), 122 (b) (2) (A). (If this question is answered in the negative, Old Commonwealth and New Commonwealth were required to compute their excess profits taxes for 1944 on the annualization basis provided in § 711(a) (3) of the Code);

---

1. Subsequent to the bringing of the action, this total has been decreased slightly because of the concessions made by both sides.

2. This amount was originally $120,928.73. For the purpose of this case, the amount has been decreased on account of concessions made by defendants.

2. Did the Commissioner of Internal Revenue properly increase New Commonwealth's reportable gross income for the year 1944 by the amounts of $41,000 and $174,189.67, which he contends represented reinsurance premiums received by New Commonwealth to reinsure risks previously undertaken by Penn-Title, a former subsidiary of Central-Penn; may Penn-Title claim those amounts either as ordinary business expense under §§ 204(b) (5), 204(c) (1) and 23(a), or in the alternative as a loss allowable under §§ 204(c) (10) and 23 (f) of the Code;

3. (A) Whether certain expenditures made by New Commonwealth in 1945 and 1946 in rearranging information and improving its title plant under a contract with Remington Rand, Inc. were ordinary and necessary expenditures under §§ 204(c) (1) and 23(a) (1), or constituted capital expenditures according to § 117 (a) of the Code as determined by the Commissioner; (B) If the expenditures were for capital improvements, is New Commonwealth entitled to deductions on account of depreciation of the materials purchased under the contract by virtue of §§ 204(c) (8) and 23(*l*) (1) of the Code;

4. Were attorney's fees paid in connection with the Remington Rand contract deductible by New Commonwealth as ordinary and necessary expenses; and

5. Was New Commonwealth in 1945 and 1946 entitled to a deduction for a reasonable allowance for exhaustion, wear and tear or obsolescence in connection with its title plants under §§ 204(c) (8, 10) and 23(*l*) (1) of the Code.

From the stipulations of facts and the evidence presented to it, the court makes the following

### Findings of Facts

#### I and II. Facts Concerning the First Two Issues

1. The plaintiffs are as follows: (a) Commonwealth Title Company of Phila-delphia ("New Commonwealth") a corporation organized under the laws of Pennsylvania on March 31, 1944 for the purpose of insuring owners of real estate, mortgagees and others interested in insuring real estate from loss by reason of defective titles, liens and encumbrances; and (b) Central-Penn National Bank of Philadelphia ("Central-Penn"), a national banking association created and existing under the laws of the United States. Both plaintiffs have their principal places of business in Philadelphia, Pa.

2. In April of 1929 Commonwealth Title Company of Philadelphia ("Old Commonwealth") was incorporated and succeeded to the rights and liabilities of both The Title Company of Philadelphia and Commonwealth Title Insurance Company, and in so doing it acquired the title plants of those companies.[3] At that time Provident Trust Company, with the exception of qualifying shares, owned all the shares of Commonwealth Title Insurance Company, the successor to Commonwealth Title Insurance & Trust Company.

3. Upon the formation of Old Commonwealth, the name of Commonwealth Title Insurance Company was changed to Provident Title Company. The latter was allowed to remain inactive until it was dissolved in 1945, so as to permit most of the possible liabilities on outstanding policies to become "washed out" by virtue of the running of the statute of limitations. Prior to its dissolution, a reinsurance premium of $50,000 was paid by Provident Title Company to Old Commonwealth in consideration of the latter's reinsuring the almost "washed out" risks.

4. In 1929 Central-Penn absorbed American Title & Trust Company which had at that time about 25 million dollars of outstanding title policies. Central-Penn, through its subsidiary, then organized American Title which assumed these liabilities. Central-Penn then paid American Title a reinsurance premium

---

3. A title plant is a term used to denote the composite records, filing cabinets and similar paraphernalia used by a title in-surance company for searching title to real property.

of $25,000 which was approximately one-tenth of one percent of the amount of the title policies reinsured.

5. On December 3, 1929, Pennsylvania Title Insurance Company of Philadelphia ("Penn-Title") was organized.

6. On December 24, 1929, Central-Penn acquired all but 300 of the 50,800 outstanding shares of stock of Penn-Title as part of a final liquidating dividend of a subsidiary at a cost of $838,039.06. At the time, the additions to the reserve fund of Penn-Title totaled $49,189.89. This sum was not taken into account in determining the cost of the 50,500 shares of Penn-Title stock. Between February 17 and April 1, 1944, Central-Penn acquired an additional 210 shares of Penn-Title stock at a cost of $3,000; the remaining 90 shares were held by three directors of Penn-Title.

7. Also on December 24, 1929, Penn-Title absorbed the rights and liabilities of American Title Company. As a result of the merger, the reserve fund of Penn-Title was increased by $3,025.81, the amount of the reserve fund of American Title. Over the years in which such fund was accumulated, American Title included such increments in its gross income for federal tax purposes.

8. From 1930 until March 31, 1944, as required by Pennsylvania law, Penn-Title had accumulated a reserve fund of $174,189.67. This fund was earmarked and kept separate and apart from the general funds of the company. In its books, separate accounts were maintained entitled "Reinsurance Reserve Fund", "Uninvested Re-insurance Reserve Fund" and "Invested Re-insurance Reserve Fund". Securities and mortgages, approved by the Insurance Commissioner of Pennsylvania, in which the funds were invested were registered in the name of "Pennsylvania Title Insurance Company, Reinsurance Reserve Fund" or "Pennsylvania Title Insurance Company, in Trust for its Re-insurance Reserve". Cash funds were deposited in a separate bank account held in the name of "Pennsylvania Title Insurance Company, Reinsurance Reserve Fund". This fund had been accumulated by Penn-Title by deductions from title insurance premiums received by it during the fourteen-year period of its existence. In the calendar years in which the deductions were made, Penn-Title has included such amounts in its gross income for federal tax purposes.

9. Immediately prior to April of 1944, of the title companies mentioned, only Old Commonwealth and Penn-Title were competitively engaged in the business of insuring titles to real property in the Philadelphia area. Over the period of fourteen years during which Penn-Title had been doing business, it had paid out approximately $25,000 in actual losses upon titles it had agreed to insure.

10. Sometime in the early 1930's, the Comptroller of the Currency requested Central-Penn to dispose of its interests in title insurance companies since they were non-legal holdings for a national bank. Several years later Central-Penn began to make efforts to sell its title insurance interests in view of the renewed insistence of the Comptroller. It turned to Old Commonwealth as a logical transferee. The latter was interested and negotiations leading up to the agreement of March 15, 1944 got under way. These negotiations had at all times been conducted at arm's length.

11. The original proposal of Central-Penn contemplated the sale of the entire shares of stock of Penn-Title at a figure approximating its net book value. This proposal was turned down by Old Commonwealth for two reasons: (a) It did not want to purchase all of the assets of Penn-Title, and (b) Pennsylvania law would not permit it to purchase any part of the shares of stock.

12. Old Commonwealth then suggested that Penn-Title be liquidated and its insurance liabilities reinsured. This suggestion was turned down by Central-Penn because a transfer under that form would have required, among other things, Penn-Title to transfer its reserve fund to the Insurance Commissioner and would not create the impression for the benefit of former customers of Penn-Ti-

tle that Old Commonwealth was continuing the business of Penn-Title.

13. Different plans were then considered for the transfer of the assets and liabilities of Penn-Title. The plans differed as to which assets would be transferred to Central-Penn and which to Old Commonwealth, and the price which the latter would pay for those assets. Finally the negotiations centered upon the transfer to Old Commonwealth of Penn-Title's plant, furniture, fixtures and reserve fund, and Old Commonwealth's assumption of Penn-Title's insurance liabilities.

14. The book value, less depreciation, of these assets, not taking into consideration the reserve fund, was $320,722.66. After further bargaining on the part of Old Commonwealth that figure was reduced by subtracting $43,722.69 as follows:

(a) $25,000: this sum was based on the supposition that from Penn-Title's fourteen years experience in the title business, New Commonwealth would in all likelihood have to pay out approximately that amount in losses following the latter's assumption of liabilities on title insurance policies underwritten by Penn-Title;

(b) $16,000: the amount equal to the balance remaining in the assets of Penn-Title out of a reinsurance premium of $25,000 paid by Central-Penn to American Title prior to the latter's merger with Penn-Title. (This amount was included in the deductions on the theory that if there was any reason for paying the $25,000 reinsurance premium in 1929, a contingent liability risk of $16,000 still remained on that group of policies); and

(c) $2,722.66: the sum equal to the price to be paid for obtaining nine shares of stock of Old Commonwealth which were to be turned over to three directors of Penn-Title in liquidation of their 90 shares of Penn-Title stock and to qualify them as directors of New Commonwealth when it became organized.

15. In an arms-length transaction, a company reinsuring the outstanding insurance liabilities of Penn-Title would, in all probability, request a premium in the neighborhood of $215,000.

16. In order to overcome the unfavorable features of a liquidation and reinsurance, and to create an appearance of continuity so that former customers of Penn-Title would tend to regard New Commonwealth as continuing the business of Penn-Title, it was ultimately decided by the parties concerned that the transfer be effected through the form of a statutory merger and consolidation. Under this form of transfer New Commonwealth would become liable, as a matter of law, on all of Penn-Title's outstanding policies.

17. Therefore on March 15, 1944, Old Commonwealth and Penn-Title entered into an agreement designated as: "Joint Plan of Merger and Consolidation". Pursuant to that agreement New Commonwealth was to be incorporated under the name Commonwealth Title Company of Philadelphia. According to the joint plan, upon its consummation all the rights of both Old Commonwealth and Penn-Title, subject to certain provisions for the distribution of Penn-Title's assets, were to be deemed as being transferred to New Commonwealth, and the title plant, furniture, fixtures and reserve fund of Penn-Title were to be transferred to New Commonwealth. For the transfer of these assets Central-Penn had the option of either accepting $277,000 in cash from Old Commonwealth or receiving shares of stock of New Commonwealth in exchange for the stock of Penn-Title at the rate of one for ten. However it was understood by Old Commonwealth and Central-Penn that the latter would not become a stockholder of New Commonwealth. The capital stock of Old Commonwealth was to be converted into that of the new corporation by an exchange on a share for share basis, and the present certificates of shares of stock of Old Commonwealth were to be the certificates of the shares of stock of New Commonwealth; that is, no exchange of certificates was necessary..

18. As of this date Old Commonwealth had outstanding 20,000 shares of stock of par value of $100 each, while Penn-Title had 50,800 outstanding shares of par value of $10 each.

19. On March 20, 1944, Central-Penn, in order to facilitate liquidation of Penn-Title, purchased $220,000 worth of mortgages from Penn-Title. Between March 24 and 31, 1944, Central-Penn, as "trustee" for Penn-Title's stockholders who would not accept shares of New Commonwealth, received from Penn-Title, as a liquidating dividend, cash in the amount of $464,441.00 and assets having a net fair market value of $192,326.77, or a total of $656,767.77.

20. As of March 31, 1944, the securities comprising the major portion of the reserve fund of $174,189.67 had been liquidated in contemplation of its transfer along with the remaining assets to New Commonwealth.

21. On March 31, 1944, New Commonwealth was incorporated with an authorized capital stock of $3,125,000 divided into 31,250 shares of par value of $100 each. Besides taking over all the assets which had been owned by Old Commonwealth, it adopted the seal and by-laws of that company and had the same powers and privileges possessed by the former company.

22. Upon New Commonwealth's incorporation, Central-Penn did not receive any stock in New Commonwealth, but accepted payment of $277,000 in cash from Old Commonwealth. New Commonwealth, having succeeded to the rights of Old Commonwealth, obtained title to the title plant, fixtures, furniture and the $174,189.67 fund of Penn-Title; it also assumed, as a matter of law, the contingent liabilities of over 347 million dollars of outstanding title insurance of Penn-Title.

23. The fund of $174,189.67 was transferred from the account in which it was deposited with Central-Penn to the new account opened by New Commonwealth by check drawn on the "Pennsylvania Title Insurance Co. Reinsurance Reserve Fund" to the order of the "Commonwealth Title Company of Philadelphia Legal Reserve Fund". This fund was added to that of New Commonwealth's reserve fund, bringing it to a total of $490,644.88, just $9,355.12 short of the required statutory maximum of $500,000. This reserve fund was earmarked and kept separate and apart from the general funds of New Commonwealth just as Old Commonwealth and Penn-Title had done in the past with their reserve funds.

24. The assets of Penn-Title were transferred to Central-Penn and New Commonwealth by means of a liquidation. Those assets, exclusive of the reserve fund, transferred to New Commonwealth were purchased for $277,000 in cash.

25. The reduction of $41,000 in the purchase price and the transfer of the $174,189.67 fund were in consideration of New Commonwealth's assumption of Penn-Title's insurance liabilities. Together they constituted a premium for reinsurance.

26. On or about March 31, 1944, Penn-Title delivered to the designated three directors three shares each of New Commonwealth stock. These shares were purchased by Old Commonwealth for the sum of $2,722.66.

27. The stock certificates representing the 50,710 shares of Penn-Title were retained by Central-Penn and were at no time surrendered or transferred by it.

## III. Facts Concerning the Third Issue

28. For some time prior to 1945, New Commonwealth had given consideration to ways and means of improving the operation of its active title plant—the one which had originally been acquired from the Title Company of Philadelphia in 1929—in order to eliminate some of the labor and to reduce the time required to issue settlement certificates. While the information contained in that plant in conjunction with that obtained from the other two plants was adequate, the arrangement of records and the method of compiling the desired information was cumbersome for the purpose of searching the title on a particular piece

of property when title insurance was ordered. Therefore it decided to install a system proposed by Remington Rand, Inc. for additions and a rearrangement of some of the information already contained in the active plant.

29. On June 4, 1945, New Commonwealth entered into a contract with Remington Rand, Inc. under which the latter agreed to furnish materials, services and part of the labor needed in connection with the installation of the system.[4]

30. Pursuant to that contract, with certain modifications, Remington Rand did the following:

(a) Dexigraphed (photostated) all deeds recorded in the Recorder of Deeds office during the period November 1, 1925 to October 1, 1945;.

(b) Prepared a title folder for each parcel of real estate in Philadelphia; bound in chronological order all the dexigraphs of the recorded deeds relating to a particular piece of property and placed them in the folder for that property; transcribed on the folder in the space provided for that purpose the volume numbers and pages of the official deed books in which the related deeds appear and the dates of the deeds, and also the application number of the policy (back title bundle), if previously insured by New Commonwealth and its predecessors in title, covering the parcel of real estate or a larger tract of which the parcel is a part. These folders were filed in accordance with the prior locating code. They eliminated the use of registry books and the making of typed abstracts of recorded deeds.

(c) Prepared "Soundex" cards, an index system of various colored cards, on which information possibly affecting parcels of real estate—such as unsatisfied judgments, liens, bankruptcies, and wills were typewritten.

(d) Assisted in setting up the "Photo Plan Index" by photographing each city block in Philadelphia shown on the large locating map, and then filing each photograph alphabetically or numerically by street names.

31. A summary of the amounts paid by New Commonwealth for the labor and materials supplied by Remington Rand, and the year in which and the purpose for which it was paid is as follows:

| | | 1945 | 1946 |
|---|---|---|---|
| a. | Dexigraphs | | |
| | Material | $11,908.07 | $137,852.70 |
| b. | Title Folders | | |
| | Labor | 6,591.93 | 86,544.30 |
| | Material | 20,384.00 | |
| c. | Soundex Cards | | |
| | Labor | 32,500.00 | 3,500.00 |
| | Material | 4,937.53 | 1,524.71 |
| d. | Photo Index Plan | | |
| | Labor | | 5,400.24 |
| | Total: | $76,321.53 | $234,821.95 |

32. Upon their installation, the title folders, dexigraphs and Soundex Cards became permanent records of New Commonwealth. They materially added to the value of the plant and appreciably prolonged its life as an operating plant. They had a useful life extending far beyond the years of their installation, and

4. Installation of the new system required the purchase of cabinets, safe files, cameras and accessories. The cost of this equipment was capitalized and has not been claimed to be deductible as a current expenditure.

the benefits derived from them were of a permanent character and cannot be confined to the years of installation. The expenditures for these improvements were not customary and of frequent occurrence.

IV. Facts Concerning the Fourth Issue.

33. In 1945, New Commonwealth paid its attorney a fee of $3,000 for legal services rendered in preparation of the Remington Rand contract and in connection with the question whether New Commonwealth might possibly claim abandonment and obsolescence of its title plants for Federal tax purposes. Sixty-five percent or $1,950 of the fee was paid in connection with the contract, and the remaining portion of $1,050 was paid for tax advice.

V. Facts Concerning the Fifth Issue

34. During the years 1944, 1945 and 1946, New Commonwealth owned three title plants. Two of them were acquired by Old Commonwealth in 1929; one from the Title Company of Philadelphia, and the other from Commonwealth Title Insurance Company. The third was the former Penn-Title plant. The acquisition of the Penn-Title plant by New Commonwealth was not for the purpose of taking the place of outmoded or less efficient ones. All three of the plants were respectively located on different floors of its twelve-story building at 1220–1224 Sansom Street, Philadelphia.

35. From the time of its acquisition, the Title Company of Philadelphia plant ("operating plant") was kept up to date by the addition of current information, while the other two, although used to a certain extent, were not.

36. With the exception of the information contained in the back title bundles of the Penn-Title plant concerning properties for which Old Commonwealth had never received an application for insurance, the system and records of the Penn-Title plant, at the time of its acquisition in 1944, was a duplication of that contained in the Old Commonwealth plants. As a matter of fact, the records of the Penn-Title plant were made up largely from those of the title plants owned by New Commonwealth. Old Commonwealth was aware of the duplication.

37. Two of the reasons why Old Commonwealth desired to gain possession of the Penn-Title plant were to eliminate a competitor and to prevent those records from falling into the hands of an existing competitor in the title business.

38. Before insurance was issued by New Commonwealth on a particular piece of real estate for the first time, title of that property was traced back until the basic title was found. All the information contained in the semi-active plants concerning that property was assembled into one report. This report was incorporated into a group of papers called a back title bundle which contained the briefs of titles, affidavits and other papers correcting defects. These bundles were then stored in the operating plant. If further insurance was subsequently sought for that same parcel of real estate or portion thereof, reference was made only as far back as the back title bundle. The search was then brought up to the date of the latest application for insurance from the information contained in the active plant. Consequently in cases where further insurance was applied for on the same piece of property, the records in the two semi-active plants relating to that property were no longer needed by New Commonwealth.

39. In 1943 there were approximately 530,780 parcels of real estate in the City of Philadelphia. As of 1946, New Commonwealth and its predecessors in title had issued title insurance, at least once, on 388,969 of those parcels, leaving 141,811 parcels on which it had not written insurance.

40. New Commonwealth has been issuing on the average 3,165 policies of insurance annually on parcels of real estate which it had never insured in the past.

41. It is pure speculation to say that in the foreseeable future New Commonwealth will have issued insurance on the remaining properties. However, the

likelihood that it will approach that point in the year 1986 is extremely great.

42. By 1986 the records of the two semi-active plants which go back beyond the date of the latest application for title insurance will be useless. As a result those plants will have no substantial commercial use or salvage value and will be substantially obsolete by that year.

43. It could not have been foreseen with reasonable certainty until the time New Commonwealth discovered it in the year 1946 that the semi-active plants would become obsolete in 1986.

### VI. Facts Relating to the Filing of Federal Tax Returns

44. Defendants, Joseph F. J. Mayer and Francis R. Smith, were the United States Collectors or Acting Collectors of Internal Revenue for the First District of Pennsylvania to whom income taxes and interest were paid for the period here involved. Defendant, Joseph F. J. Mayer, was the Acting Collector for the period from February 1, 1945 to April 30, 1945 and the defendant, Francis R. Smith, was duly appointed as Collector on May 1, 1945 and still remained in that office at the time these actions were brought.

45. New Commonwealth filed initial and amended income tax and excess profits tax returns for the three months period beginning January 1 and ending March 31, 1944, and for the period beginning April 1 and ending December 31, 1944 with the Collector of Internal Revenue at Philadelphia. In the original return for the latter period, its excess profits tax net income was annualized, and no claim was made for the carryover of unused excess profits tax credit or an unused capital loss deduction of Old Commonwealth. It also filed initial and amended income and excess profits tax returns for the year 1945, and an income tax return for 1946.

46. New Commonwealth paid income and excess profits taxes in the net amounts and for the periods indicated as follows:

| Tax | Amount | Period |
|---|---|---|
| Income Tax | $ 96,858.89 | Apr. 1 to Dec. 31, 1944 |
| Excess Profits Taxes | $359,295.11 +63,942.93* | Apr. 1 to Dec. 31, 1944 |
| | $423,238.04 —14,877.57** | |
| | $408,360.47 | |
| Income Tax | $154,098.46 | 1945 |
| Excess Profits Taxes | $358,501.51 +31,353.03* | |
| | $389,854.54 | 1945 |
| Income Tax | $480,301.45 +15,198.50* | |
| | $595,499.95 | 1946 |

*Interest
**Postwar Credit

47. On June 28, 1950, New Commonwealth filed with the Collector for the First District of Pennsylvania claims for refunds of excess profits taxes collected

by defendants for the period beginning April 1 and ending December 31, 1944, and for the year 1945, and for income taxes collected by defendants for the year 1946.

48. On or about March 15, 1945, Central-Penn filed with the Collector of Internal Revenue for the First District of Pennsylvania a consolidated income tax return for the year 1944 in which there was reported on a consolidated basis the income of Penn-Title for the period from January 1 through March 31, 1944 and the income of Central-Penn for the year 1944. This return showed a net income for Penn-Title of $22,322.99 and for Central-Penn of $1,320,291.67. The total tax shown to be due on the return was $451,834.57.

49. Subsequently Central-Penn paid under protest to the defendant, Francis R. Smith, a deficiency in income taxes claimed by the Collector for the year 1944 amounting to $9,045.78 plus interest of $2,598.87, or a total of $11,655.-05.

50. On June 19, 1950, Central-Penn filed with the Collector an amended claim, increasing its claim filed on March 8, 1948, for refund of taxes and interest assessed and collected for the year 1944, from $109,264.08 to $120,928.73.

51. During the taxable periods involved, the taxpayers involved kept their books and reported their federal taxes on the accrual basis and according to the calendar year.

52. More than six months has elapsed between the filing of the refund claims and the institution of the actions here involved.

Conclusions of Law

1. This court has jurisdiction of the subject matter and the parties to these actions.

2. Old Commonwealth and New Commonwealth were separate corporations for tax purposes:

a. Old Commonwealth was required to report its income for the period January 1 to March 31, 1944, and New Commonwealth was required to report its income separate from that of Old Commonwealth for the balance of the year,

b. New Commonwealth was not entitled to the benefits of carry-over losses or unused excess profits tax credits of Old Commonwealth for 1942, 1943 and the period January 1 to March 31, 1944, under the provisions of §§ 122 and 710 (c) (3) of the Internal Revenue Code, 26 U.S.C.A. §§ 122, 710(c) (3), and

c. In computing their respective excess profits taxes for 1944, Old and New Commonwealth were required to compute them on the annualization basis provided in § 711(a) (3) of the Internal Revenue Code, 26 U.S.C.A. § 711(a) (3).

3. The sum of $41,000 representing the reductions of $25,000 and $16,000 respectively in the purchase price for Penn-Title's assets was a reinsurance premium:

a. This sum constituted income to New Commonwealth;

b. This same sum constituted a deductible expense for Penn-Title for the year 1944.

4. The fund of $174,189.67, at the time New Commonwealth became the owner of it, was not impressed with a trust and represented a premium for reinsurance:

a. New Commonwealth realized income as a result of the acquisition of that fund on April 1, 1944;

b. Penn-Title was entitled to a deduction in that amount as an ordinary and necessary business expense for the year 1944.

5. (A) Penn-Title constructively received the entire proceeds of $277,000 in cash and $2,722.66 in the form of nine shares of New Commonwealth stock for a transfer of part of its assets. (B) Penn-Title distributed, as a final liquidating dividend, the cash of $277,000 to Central-Penn, and the nine shares of stock to its three directors who were to become directors of New Commonwealth.

6. The sums of $76,321.53 and $234,-821.95 paid by New Commonwealth in 1945 and 1946 respectively for materials

and labor relating to the installation of an improved system for searching titles to real property represented capital expenditures and were not deductible as ordinary and necessary business expenses in 1945 and 1946.

7. Of the $3,000 paid by New Commonwealth for legal services, only the amount of $1,050 is deductible as an ordinary and necessary business expense, the remaining $1,950 is not deductible.

8. (A) There has been no exhaustion, wear or tear of New Commonwealth's title plants within the meaning of the Code. (B) New Commonwealth is entitled to a deduction for obsolescence for the title plant acquired by its predecessor in title from Commonwealth Title Insurance Company based on a useful life termination in 1986. (C) However it is not entitled to a deduction for exhaustion, wear and tear or obsolescence in connection with the plant acquired by it from Penn-Title.

### Discussion

██ I. As for the first issue there can be no question that under Pennsylvania law, Old Commonwealth and New Commonwealth were distinct and separate corporations. It is a general rule that for federal tax purposes, corporate entities are recognized, and such entities must not be ignored except under unusual circumstances. Moline Properties v. Commissioner, 1943, 319 U.S. 436, 63 S. Ct. 1132, 87 L.Ed. 1499. Therefore the question posed is whether Old Commonwealth and New Commonwealth should be treated as the same entity or as separate corporations for tax purposes. We think the answer to that question is controlled by the decision of our Court of Appeals in Pennsylvania Co., etc. v. Commissioner, 3 Cir., 1935, 75 F.2d 719. In that case the Court held that the consolidated corporation, formed by the merger of two corporations under Pennsylvania law, was a separate taxpayer and therefore could not avail itself of its constituents' losses for federal tax purposes. Also see Brandon Corp. v. Commissioner, 4 Cir., 1934, 71 F.2d 762; but compare Stanton Brewery, Inc., v. Commissioner, 2 Cir., 1949, 176 F.2d 573 and Anheuser-Bush, Incorporated v. Becker, D.C., E.D. Mo.1940, 40-4 CCH Fed.Tax Serv., Par. 9295.

II. Was all or part of the amount of $215,189.67, by which the Commissioner increased New Commonwealth's reportable income, to be considered as a reinsurance premium? This problem can be better understood if we look into the reasons why the particular mode for transferring the assets and insurance liabilities of Penn-Title was followed.

There were two methods by which Central–Penn could dispose of its holdings in Penn-Title. One was by the sale of the shares of stock, the other was by the liquidation of that company's assets and the reinsurance of its outstanding insurance policies. A sale of the stock was preferred by Central-Penn, but this method was turned down for two reasons. First, Old Commonwealth did not want to purchase all of the assets of Penn-Title, and second, Pennsylvania law would not permit it to purchase any part of the stock.[5] A bona fide liquidation was not favored by Central-Penn because a transfer under that form, among other things, would have required Penn-Title to transfer its reserve fund to the Insurance Commissioner. A consolidation and merger [6] would have permitted Penn-Title to transfer its reserve fund, along with its other assets, to the new corporation. However a true consolidation and merger would leave Central-Penn still in the possession of holdings in a title insurance company. This of course would not obviate the objec-

---

5. Section 603 of the Act of May 17, 1921, P.L. 682, art. VI, as amended, 40 P.S. § 723, provides in part: "Any money over and above the capital of any such stock casualty insurance company may be invested in the securities * * * except its own stock or the stock of any other insurance company transacting like classes of business."

6. The power to merge and consolidate is granted by § 332 of the Act of May 17, 1921, P.L. 682, art. III, 40 P.S. § 455.

tions of the Comptroller of the Currency.

To eliminate the unfavorable features, a method of transfer was suggested by the parties concerned which would permit Central-Penn to both divest itself of holdings in a title insurance company and transfer Penn-Title's reserve fund, and at the same time allow Old Commonwealth to purchase some of the assets and assume the insurance liabilities of Penn-Title. Consequently what actually took place, albeit through the form of a statutory consolidation and merger, was the transfer of Penn-Title's assets by means of a liquidation of those assets and reinsurance of its liabilities. Despite the form under which the transfer was made, it is clear to us that for federal tax purposes, Old Commonwealth purchased the assets that New Commonwealth received from Penn-Title, and New Commonwealth assumed the insurance liabilities of that company for a premium received by Old Commonwealth. See: Commissioner of Internal Revenue v. Court Holding Co., 1954, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 567 and Morgan Mfg. Co. v. Commissioner, 4 Cir., 1941, 124 F.2d 602.

 It is claimed by New Commonwealth that neither it nor its predecessor received a premium for assuming such liabilities. Obviously it did not assume those liabilities without its predecessor receiving some benefit. Part of that benefit was reflected in a reduction in the purchase price of Penn-Title's assets. A reduction in the purchase price is not per se income to the purchaser.[7] Nevertheless, where that reduction may be measured and its purpose determined, as in these actions, by an amount which the one assuming the obligation, in an arms-length transaction,

would request, the amount of the reduction is income. For this reason we have little difficulty in finding that the reduction in the purchase price of $41,000, consisting of the sum of $25,000 and $16,000, as being a premium for New Commonwealth's assuming the liabilities on some of Penn-Title's policies. Premiums are income to the insurer. Wayne Title & Trust Co. v. Commissioner, 3 Cir., 1952, 195 F.2d 401. Therefore New Commonwealth, in reporting its income for the year 1944, should have included the $41,000 item, and Penn-Title could have used that same amount as a deductible expense.

 The question involving the sum of $174,189.67 is a little more troublesome. It seems clear from the evidence that the amount of $277,000 was paid by Old Commonwealth solely for the title plant, furniture and fixtures, and therefore the amount of the reserve fund was not taken into consideration in arriving at the figure of $277,000. However the fund was transferred for some purpose and for a consideration. The purpose was for relieving Penn-Title from further obligation on over 347 million dollars of title insurance policies, and the consideration was New Commonwealth's assumption of that obligation, which followed by operation of law.[8] Had it not received the fund, New Commonwealth would have been required to build a reserve fund equal in amount to $174,189.67, from its own resources. See sections 1 (a, b, c) of the Act of April 26, 1929, P.L. 834, 40 P.S. §§ 151–153. If in fact this had been the case, Old Commonwealth would surely have required that the $277,000 be reduced by $174,189.67. For federal tax purposes the transfer of the fund was in substance

---

7. See 1 Merten's Law of Federal Income Taxation § 5.25.

8. The wonder why a company would reinsure such a large amount of risks for a small premium disappears when one considers that title insurance is different from other kinds of insurance. Title insurance is not a continuing agreement to protect the insured against a possible future loss; it is a guarantee, rather, that the original title examination was correct. Thus, any liability on the outstanding policies of Penn-Title which the taxpayer assumed represented simply the risk of loss which might result from errors which had been made in the original title examination.

and effect nothing more than the payment of a premium for reinsurance.

Notwithstanding the care Old Commonwealth took to segregate and identify the fund during its transfer, we cannot say that it was impressed with a trust. New Commonwealth did not succeed to the title of the fund as a matter of law; nor was it the transfer of a trust res by a trustee to a successor trustee. As stated in Wayne Title & Trust Co. v. Commissioner, 3 Cir., 1952, 195 F.2d 401, 403: "The required maintenance of a minimum proportional relationship is in itself not enough to make a part of any premium a trust res as it is received. It is much more significant that the insurer was explicitly authorized to use resources other than current premiums to establish and maintain the required fund. The flexible scheme for the accumulation of a reinsurance reserve must be considered whole, and so viewed cannot be described as imposing a trust upon premiums as received." Therefore we must conclude that the Commissioner was right in concluding that the fund of $174,189.67 was includable in New Commonwealth's reportable income for 1944. It follows, we think, that Penn-Title should have been permitted to deduct a similar sum from its reportable income for the same year.

III. Under the third issue New Commonwealth contends that it is entitled to deduct from gross income amounts paid for labor and material supplied by Remington Rand, Inc. as ordinary and necessary business expenses under §§ 23(a) and 204(c) (1) of the Internal Revenue Code.

Under the findings of facts, this court has found that the amounts paid out were for capital improvements. We think the code and the cases support such a finding. See § 24(a) (2) of the Code; Hotel Kingkade v. Commissioner, 10 Cir., 1950, 180 F.2d 310; Parkersburg Iron & Steel Co. v. Burnet, 4 Cir., 1931, 48 F.2d 163.

In the alternative, New Commonwealth claims that if the payments were for capital improvements, the materials purchased in connection with the Remington contract are subject to depreciation. This may be so. However, it has offered no evidence as to the life of the improvements, and there is no evidence from which this court can determine the proper rates of depreciation to apply. Therefore the claimed deductions under this heading are not allowable in whole or in part.

IV. As for the portion of the attorneys' fee paid in connection with the Remington Rand contract, its deductibility depends on whether the expenditures for labor and material under the contract were ordinary and necessary. Thompson v. Commissioner, 9 B.T.A. 1342. Such portion of the fee is therefore not deductible.

V. Section 23(l) of the Internal Revenue Code allows as a deduction from gross income "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business * * *." The concession must be made from the outset that if the deduction is allowed here under this section of the Code, it must be for obsolescence and not for exhaustion, wear or tear of the title plants. Real Estate-Land Title & Trust Co. v. United States, 1940, 309 U.S. 13, 15, 60 S.Ct. 371, 84 L. Ed. 542. The defendants assert that there can be no claim for a deduction based on obsolescence of a title plant because the determination as to the time when its useful value would cease is too speculative and uncertain. However a deduction based on such an allowance has been permitted. Crooks v. Kansas City Title & Trust Co., 8 Cir., 1931, 46 F.2d 928.

It is quite evident that the two title plants are currently on the road to obsolescence. Similarly there is a date in the future upon which those plants will cease to have any value for purposes of title search. The problem is to ascertain that date. As in the case of determining the anticipated life of other physical property for depreciation purposes, the useful lives of these plants cannot be determined with mathematical exact-

ness. It is a matter of arriving, as best we can, at a reasonable conclusion respecting the future based on presently known facts concerning the plants and New Commonwealth's methods of operation.

Defendants say that the evidence is insufficient to project the value of the plants to zero either in 1986, a date claimed by New Commonwealth, or any other future year. Obviously the rate of New Commonwealth's issuance of insurance will vary from year to year, and that rate will decrease as the years go by. The happy situation where New Commonwealth will have insured the title to every parcel of real estate in Philadelphia at least once will in all probability never be attained. However in a period of forty years it will come sufficiently close to having insured most of the parcels that the major portion of the information in the two plants will have been superseded by the information in the back title bundles. Merely because at the end of that period there will be some bits of valuable information inextricably mixed up with stacks of useless records is no reason for concluding that obsolescence cannot occur at that time. All that is necessary is that it appear with reasonable certainty that in the first year in which the deduction is used that obsolescence will occur at a fixed time in the future. That appears from the evidence in the action before us.

Although the matter has not been raised by either side, we think another point merits discussion. New Commonwealth concedes that the plant purchased from Penn-Title was, with the minor exception pointed out in the findings of facts, a duplication of its already existing plants. Under these circumstances it seems to this court that New Commonwealth cannot claim a reasonable allowance for obsolescence for that plant. We think the holding in the Real Estate-Land Title & Trust Co. case, supra, compels this conclusion. In that case, it is true, the duplicate plant was not being used. But use or non-use is not, in our opinion, the controlling factor; duplication of information in the plant accompanied with knowledge of this fact or circumstances under which it should have been known by the taxpayer that the plant in question is a duplicate are deciding factors. In the action before us the information in the Penn-Title plant, prior to its transfer to New Commonwealth, was complete, sufficient and functionally adequate for the purpose of carrying on the title insurance business. It is evident that New Commonwealth was aware of this fact.

Accordingly, the parties to these actions may prepare final orders. However, the entry of judgment in these actions shall be suspended and the parties shall file within sixty days from the date hereof computations showing the amount of refunds to which the plaintiffs are entitled in accordance with the foregoing findings of facts and conclusions of law and the names of the defendant or defendants against whom judgment shall be entered. If the parties shall be unable to agree upon these matters within the sixty-day period, this court shall set a date to resolve the difficulty upon motion of either side, and will hear such evidence as may be necessary.