INTERNATIONAL LIFE INSURANCE COMPANY (FORMERLY STATE INSURANCE CO. OF KENTUCKY), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1307–67.   Filed February 17, 1969.

*Harry L. Brown,* for the petitioner.
*John J. Larkin* and *Dennis M. Feeley,* for the respondent.

TANNENWALD, *Judge:* The respondent determined deficiencies in the income tax of petitioner for the years 1960 and 1961 in the amounts of $31,704.08 and $54,339.10. The issue for our consideration is the existence and extent of a net operating loss in 1957, which it is conceded can be carried over to the subsequent taxable years. The resolution of this issue depends upon whether petitioner erroneously reported certain unearned premiums and liabilities assumed as income in 1957 and whether it can amortize the consideration paid for health and accident insurance policies, or any part thereof.[1]

---

[1] Petitioner has not contested respondent's disallowance of a deduction of legal fees in the amount of $1,750 for the taxable year 1960.

FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

Petitioner is an insurance company organized under the laws of Kentucky on August 31, 1955, with its principal place of business in Louisville, Ky., at the time of the filing of the petition herein. It filed corporate income tax returns for the taxable years in question with the district director of internal revenue, Louisville, Ky. On March 22, 1966, petitioner's name was changed from State Insurance Co. of Kentucky to International Life Insurance Co. The parties have stipulated that, during the taxable years at issue, petitioner was taxable as an insurance company other than a life or mutual insurance company within the meaning of section 831(a) (1) of the Internal Revenue Code of 1954.

Republic Casualty Insurance Co. (hereinafter Republic) was incorporated in Kentucky as an insurer of health and accident policies and full coverage automobile insurance policies.

On August 30, 1956, the Kentucky Insurance Commissioner filed an "Application for Order of Rehabilitation" in the Franklin Circuit Court in which he alleged Republic "to be in such condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, members, subscribers, stockholders, or to the public." On October 20, 1956, the Franklin Circuit Court issued an order appointing the insurance commissioner Rehabilitator of Republic with authorization to negotiate an agreement with an acceptable insurer in order to substitute another company in place of Republic.

Thereafter, pursuant to an agreement (entitled "Reinsurance Agreement") between Republic and petitioner, dated January 18, 1957, and effective as of January 1, 1957, Republic ceded to petitioner and petitioner assumed all of Republic's health and accident policies in force as of the effective date of the agreement.

The agreement provided in pertinent part:

ARTICLE II

In consideration of the cession by REPUBLIC of such policies, STATE does hereby agree to pay to REPUBLIC one-half of an annual premium on each policy so ceded. Twenty per cent (20%) of such annual premium shall be paid immediately upon presentation by REPUBLIC of a list duly verified by STATE of all such policies identified by policy number, name of insured and setting out the annual premium. From the remaining thirty per cent (30%) of such annual premium there shall be deducted when determined to the satisfaction of both parties hereto and not later than six months subsequent to the effective date of this agreement, the unearned premium and the claim liability as of the effective date of this agreement.

ARTICLE III

REPUBLIC does hereby agree to transfer and deliver to STATE each and every file and record existing in connection with such policies, including

addressograph plates and IBM cards and the filing cases in which they are contained and REPUBLIC agrees, after final approvals are secured on this agreement, to pay to STATE all premiums collected on such policies less all claims paid on such policies, subsequent to the effective date of this reinsurance agreement.

ARTICLE IV

By this reinsurance agreement, STATE does hereby assume without diminution because of the solvency or insolvency of the ceding insurer all of the liability to policyholders of whatever kind, character, or description arising out of such policies so ceded in accordance with the terms of such policies, including the obligation to reinstate any accident and health policy of REPUBLIC in accordance with its terms which was not ceded hereunder by reason of failure of the insured to pay the necessary premiums thereon, subject, however to any and all defenses against claims and actions upon such policies which have been or would have been available to the [sic] REPUBLIC had this reinsurance agreement not been made. It is understood and agreed that STATE does not assume any liability to pay commissions on such policies ceded. It is likewise understood that a collection fee payable in connection with so called franchise or payroll deduction groups is not commission.

Republic covenanted that during the succeeding 2 years it would not engage in the business of health and accident insurance and that it would not induce or encourage the owner of any policy taken over by petitioner to discontinue that policy in favor of any other company.

The other assets transferred by Republic to petitioner were a list of all policies, containing the policy number and the name of the insured and the amount of the annual premiums, IBM cards, assorted filing cabinets and desks and chairs having a value of about $400, a multilith press which was shortly abandoned, and an addressograph platemaker which was sold for $150.

None of Republic's employees, apart from clerical help, became employees of petitioner. Petitioner did not acquire the right to use the name "Republic Casualty Insurance Company" in its business, and, in fact, Republic continued to exist as a corporation subsequent to the agreement.

The Franklin Circuit Court, by an order dated January 31, 1957, approved the agreement between petitioner and Republic, appointed the Kentucky insurance commissioner as receiver for Republic "for the purpose of liquidating the business of same, not otherwise reinsured," and authorized the receiver "to negotiate * * * for the sale in whole or in part of the assets, corporate structure, liabilities, good will and experience of the Republic Casualty Insurance Company."

Petitioner issued to each Republic policyholder a certificate of assumption under which petitioner agreed to provide the coverage specified by the policy in place of Republic. The Republic policies assumed by the petitioner could be canceled or modified by the insurer at any time, and were subject to renewal only upon the payment of an additional premium.

As of January 1, 1957, Republic had 13,992 health and accident policies in force, on which the aggregate annual premium, obtained by annualizing the usual mode of payment by the policyholder, i.e., annually, semiannually, quarterly, or monthly, was $348,605.40.

Petitioner made a net cash payment to Republic of $77,019.22, determined as follows:

| | | |
|---|---:|---:|
| 50 percent of annual premiums ($353,817.10, as initially determined) | | $176,908.55 |
| Less: Unearned premiums as of 12/31/56 | $55,528.27 | |
| Unpaid claims as of 12/31/56 | 32,990.70 | 88,518.97 |
| Total | | 88,389.58 |
| Less: 1957 business adjustments: | | |
| Premiums collected by Republic | 37,279.68 | |
| Pre-1957 claims paid by Republic | (22,283.89) | |
| Post-1956 claims paid by Republic | (6,231.28) | 8,764.51 |
| Cash paid (check No. 301R, 3/4/57) | | 79,625.07 |
| Less: June 30, 1957, adjustment: | | |
| 50% of annual premium | 176,908.55 | |
| 50% of corrected premium | (174,302.70) | |
| Refunded | | 2,605.85 |
| Net cash paid | | 77,019.22 |

Petitioner initially characterized this payment as "commissions paid" on its books and records. The following journal entries were made in December 1957 on petitioner's books (thereby adjusting prior entries):

| Account identification | Dr. | Cr. |
|---|---:|---:|
| Commissions paid | | [2]$79,625.07 |
| Paid for business acquired | $176,908.55 | |
| Assets received on assumption of risks | | 88,518.97 |
| Claims paid | 28,515.17 | |
| Premium income | | 37,279.68 |
| General clearing a/c | 2,605.85 | |
| Paid for business acquired | | 2,605.85 |

Of the 13,992 policies of Republic reinsured by petitioner, at least 9,922 (or 70 percent of the total) had lapsed or otherwise terminated as of December 31, 1966, as follows:

| Year | Number terminated | Percentage terminated | Year | Number terminated | Percentage terminated |
|---|---:|---:|---|---:|---:|
| 1957 | 741 | 5.3 | 1963 | 1,734 | 12.4 |
| 1958 | 1,698 | 12.1 | 1964 | 1,691 | 12.1 |
| 1959 | 653 | 4.7 | 1965 (Oct.) | 454 | 3.2 |
| 1960 | 700 | 5.0 | 1966 (Oct.) | 809 | 5.8 |
| 1961 | 380 | 2.7 | Unknown | 621 | 4.4 |
| 1962 | 441 | 3.2 | | 9,922 | 70.9 |

---

² This was the amount originally paid in cash, which was subsequently adjusted downward to $77,019.22.

In its 1957 tax return, petitioner reported as an income item the amount of $88,518.97 as "assets received on assumption of risk" and deducted as an expense item $174,302.70 as being "paid for business acquired." Respondent has disallowed the deduction but has not made any adjustment with respect to the income item.

OPINION

We are confronted herein with the necessity of determining the tax consequences arising from a transaction whereby petitioner took over the health and accident business of an insolvent insurance company (Republic). Four issues are involved: (1) The amount of the consideration paid by petitioner to Republic; (2) the treatment of the unearned premiums on the policies assumed by petitioner; (3) the treatment of certain liabilities of Republic assumed by petitioner; and (4) whether the consideration paid, or any part thereof, may be amortized, and, if so, over what period.

Each party seeks to predetermine the issues to be resolved by attempting to fit the transaction between petitioner and Republic into a standard mold. Petitioner claims that the transaction represented nothing more than a takeover of the entire risk on Republic's policies and should be treated as a simple "assumption reinsurance" arrangement. Sec. 1.809–5(a)(7)(ii), Income Tax Regs; see *Sachs* v. *Ohio Nat. Life Ins. Co.*, 116 F. 2d 113, 116 (C.A. 7, 1940). Respondent, on the other hand, treats the transaction as a traditional acquisition of the assets and liabilities of a business. The fact is that the transaction does not fit either mold exactly. As is often the case, we must determine the tax consequences by an analysis of the realities of the situation and the provisions of section 832,[3] free of the shackles of the labels adopted by the parties and of the characterization of the transaction

---

[3] All references, unless otherwise specified, are to the Internal Revenue Code of 1954.
SEC. 832. INSURANCE COMPANY TAXABLE INCOME.

(a) DEFINITION OF TAXABLE INCOME.—In the case of an insurance company subject to the tax imposed by section 831, the term "taxable income" means the gross income as defined in subsection (b)(1) less the deductions allowed by subsection (c).

(b) DEFINITIONS.—In the case of an insurance company subject to the tax imposed by section 831—

(1) GROSS INCOME.—The term "gross income" means the sum of—

(A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners,

* * * * * * *

(3) UNDERWRITING INCOME.—The term "underwriting income" means the premiums earned on insurance contracts during the taxable years less losses incurred and expenses incurred.

(4) PREMIUMS EARNED.—The term "premiums earned on insurance contracts during the taxable year" means an amount computed as follows:

(A) From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance.

(B) To the result so obtained, add unearned premiums on outstanding business

on petitioner's books. *Doyle* v. *Mitchell Brothers Co.,* 247 U.S. 179 (1918); *Laura M. Hutchinson,* 47 T.C. 680, 686 (1967); *Pittsburgh Milk Co.,* 26 T.C. 707 (1956); *National Capital Insurance Co.,* 28 B.T.A. 1079 (1933).

Petitioner first asserts that Republic's unearned premiums and existing liabilities with respect to policy claims at the time of acquisition produced no income to it, that these items should be netted against the gross amount of one-half the annualized premium, and that the net figure thus arrived at (after adjustment for various post-acquisition items) constitutes the consideration paid. Respondent argues that the amount of unearned premiums constitutes income to petitioner and that neither those premiums nor the existing liabilities assumed reduce the consideration paid by petitioner. We agree with respondent.

We deal first with the unearned premiums of $55,528.27. The classic concept of reinsurance is a "contract by which one insurer insures the risks of another insurer." See *Guardian Life Ins. Co. of America* v. *Chapman,* 302 N.Y. 226, 243, 97 N.E. 2d 877, 886 (1951); cf. sec. 1.801–3(e), Income Tax Regs. In the hands of Republic, the amount of unearned premiums represented advance payments by the policyholders, in return for which Republic contracted to pay for any losses which the policyholders might subsequently suffer during the periods covered by the unearned premiums. Republic's risk existed only during those periods. Under normal circumstances, when another insurance company reinsures or assumes a part or all of the future risk, such advance payments, i.e., the unearned premiums covering the risk undertaken, are paid over to it and are considered an item of income. *Hoosier Casualty Co.* v. *Commissioner,* 32 F. 2d 940 (C.A.D.C. 1929), affirming 6 B.T.A. 1343 (1927); *Commonwealth Title Co.* v. *Rothensies,* 124 F. Supp. 274 (E.D. Pa. 1954). Petitioner was entitled to be paid the unearned premiums and to earn those premiums, as Republic would have, by insuring future losses under the policies during the premium periods. The credit of the unearned premiums against the consideration which petitioner was required to pay under the agreement was as much a payment of such premiums as there would have been if Republic had actually transferred funds to petitioner. The structure of the agreement between petitioner and Republic supports

---

at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.

* * * (5) LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

  (A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

  (B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

this analysis. Thus, the first sentence of Article II establishes the consideration to be paid by petitioner; the remaining sentences merely set forth the mode of payment. Similar support for this analysis is contained in the debit on petitioner's books of the full amount of $176,908.55 as "paid for the business acquired."

In *Hyde Park Realty* v. *Commissioner*, 211 F. 2d 462 (C.A. 2, 1954), affirming 20 T.C. 43 (1953), the taxpayer, a purchaser of leased real property, was held to have received taxable income from the receipt of a credit against the purchase price of rental property for advance rents received by the vendor. We think that the economics of the instant situation and the commercial intent of the parties, as reflected by their agreement, justify the same conclusion herein. Cf. *Commonwealth Title Co.* v. *Rothensies, supra*. We are not persuaded otherwise by *Evansville Courier* v. *Commissioner*, 62 F. 2d 232 (1932), reversing 23 B.T.A. 862 (1931), relied upon by petitioner, and, in any event, that case is distinguishable in that the Court of Appeals in the final analysis rested its decision on a factual conclusion as to the intent of the parties. Nor can we accept petitioner's suggestion that an equivalent amount of the purchase price was paid for the unearned premiums and that it is entitled to recover this amount before any income accrues to it. Petitioner paid Republic for the unearned premiums by assuming the concomitant future risk of losses during the premium periods, and payments of such losses would be reflected elsewhere in the computation of its taxable income. We hold that the amount of Republic's unearned premium at the time of the acquisition did not reduce the consideration paid by petitioner and should be treated as income to petitioner subject to the provisions of section 832.[4]

We now turn to the item of $32,990.70 representing the amount of Republic's liabilities to policyholders existing at the date of acquisition and assumed by petitioner. Petitioner asserts that if this item is not netted out in determining the consideration paid by it to Republic, it will in effect be held to have realized income through the assumption of liabilities. Petitioner has thus created a false issue. Although petitioner did not favor us with the accounting details which underlay the stipulated book entries, it seems clear from the information made available to us that these liabilities were taken into account by petitioner in computing its deduction for "losses incurred" under section 832(b) (5). Thus, the real question is whether petitioner is entitled to a deduction for those liabilities, not whether they constitute an item of income.

---

[4] We note that none of the unearned premiums covered a period longer than 12 months and that petitioner took over Republic's policies on the first day of its taxable year. Consequently, all of these premiums would appear to have been earned by petitioner during that year and would not be included in the unearned premium reserve. Sec. 832(b)(4) ; cf. Rev. Rul. 693, 1955–2 C.B. 284.

As a backdrop to our consideration of this issue, we note that what is involved is not losses *incurred after* petitioner took over Republic's policies. The liabilities of $32,990.70 represented the estimated amount of losses *incurred* by Republic, but not finally disposed of, *prior to* the acquisition.

In determining underwriting income as defined in section 832(b)(3), a deduction is allowed for "losses incurred" as determined under section 832(b)(5). We think that the phrase "losses incurred" includes only losses occurring during the period when the taxpayer insurance company has the risk and not losses occurring during a prior period when the risk was that of another taxpayer insurance company. Cf. *Great Southern Life Insurance Co.*, 33 B.T.A. 512 (1935), affd. 89 F. 2d 54 (C.A. 5, 1937). Accordingly, the $32,990.70 assumed liabilities in the instant case are to be treated no differently than liabilities assumed in connection with the purchase of any business. We hold that this item does not reduce the consideration paid by petitioner to Republic. We further hold that this item does not constitute income to petitioner and, likewise, that none of the liabilities involved should properly enter into the computation of petitioner's deduction for losses incurred.

In view of the foregoing, we hold that the consideration paid by petitioner to Republic was the gross amount of one-half the annualized premium. This determination brings us to the final issue involved herein, namely, whether any part of that consideration is currently deductible by petitioner. Initially, petitioner asserts that the consideration thus paid represented a commission to Republic or a reimbursement to Republic for expenses incurred by it in writing the insurance. There is no need to dwell upon the elements involved in upholding the deductibility of amounts paid by a reinsurer by way of commissions or reimbursement of expenses of the reinsured in reinsurance transactions. Cf. *National Capital Insurance Co.*, *supra; Colonial Surety Co.* v. *United States*, 178 F. Supp. 600 (Ct. Cl. 1959); sec. 832(c)(1). Nor need we concern ourselves as to whether a distinction should be drawn in this area between indemnity reinsurance transactions where the reinsured continues to deal with the policyholder and assumption reinsurance transactions where the reinsurer is substituted for the reinsured vis-a-vis the policyholder. See *Sachs* v. *Ohio Nat. Life Ins. Co.*, *supra;* sec. 1.809-4(a)(1)(iii), Income Tax Regs.; 8 Couch, Cyclopedia of Insurance Law, sec. 2260 (1931); Vance, Insurance, sec. 207 (3d ed. 1951). The simple fact is that, in the instant situation, there is no basis whatsoever for treating any part of the consideration paid as petitioner suggests. Unlike fixed term policies, such as are involved in life insurance or the usual type of liability insurance, petitioner had the right, at any time and in its uncontrolled discretion, to cancel the policies involved herein, raise the premium rates, or alter the scope of coverage. The maximum amount of insurance on which it can be said

petitioner assumed any risk is reflected in potential losses covered by the unearned premiums of some $55,000 at the time of acquisition. Under these circumstances, the assertion that petitioner would have paid a commission of the gross amount paid (some $175,000) or even the net figure used by petitioner (some $85,000) for that amount of business (or alternatively that Republic would have had expenses in those amounts in procuring such business for which it was being reimbursed by petitioner) is preposterous. Moreover, there is not the slightest indication in the agreement between petitioner and Republic that any part of the consideration paid should be so treated. Nor are we prepared to indulge in arithmetical gymnastics, as petitioner would have us do, and interpolate the consideration paid with a statistical analysis of petitioner's costs of obtaining health and accident insurance business directly.[5]

We are equally unimpressed with petitioner's claim that the consideration was paid for policies having a determinable useful life. Here again, the parties seek to resolve the issue in terms of whether the within situation fits the mold of "insurance expirations" which have been held to comprise a capital asset in the nature of goodwill and therefore are not subject to amortization. *Marsh & McLennan*, 51 T.C. 56 (1968); *Hugh H. Hodges*, 50 T.C. 428 (1968); *Alfred H. Thoms*, 50 T.C. 247 (1968). While there is no doubt that the information acquired with the Republic policies served a soliciting function for petitioner, similar to expirations, there is a fundamental distinction in that the policies on which expiration information is maintained are of finite duration, whereas the health and accident policies in question are of indefinite duration, since they terminate upon the insured's reaching age 70, death, or allowing the policy to lapse, or upon cancellation by the company. Thus, we do not think the analogy to "insurance expirations," or lack thereof, is helpful or determinative.

Nor do we think that the policies involved herein can be analogized to life insurance policies as to which amortization is permitted. Sec. 809(d)(12); sec. 1.817–4(d), Income Tax Regs. As we have previously pointed out, petitioner, unlike the insurer of life insurance policies, retained the right at any time to cancel policies, raise premium rates, and alter the scope of coverage. These rights allowed petitioner through direct and indirect means to affect the lapse rate of

---

[5] At the time of the Republic reinsurance transaction, it was the practice of petitioner, in obtaining new health and accident business, to pay, apart from other general acquisition costs, agents' commissions and override commissions aggregating 20.6 percent of the annual policy premium and, in addition, a semiannual agent's bonus equivalent to 5 percent of an annual premium on the policies in force written by the respective agents.

A statistical study of the cost to petitioner in the issuance of its health and accident policies shows that petitioner's payments to its agents and for advertising and lead procurement total about $4.78 for each dollar of monthly premium. This equals about 65 percent of the annual premium collected, because of the presence of a lapse factor, i.e., a single dollar of monthly premium issued will produce only $7.63 of collected premiums in 12 months. If the lapse factor is eliminated, the cost of placing premium income on the books is about 45 percent of an annual premium.

the policies. Petitioner could cancel high-risk policies, thereby retaining only low-risk policies, which would cause a high termination rate in early years followed by a low termination rate in later years. In addition, changes in the rate structure and coverage, if atypical of action by the insurance industry generally, would have a substantial impact on lapse rates. The evidence on which petitioner relies to buttress the requested amortization at the rate of 7.1 percent per year reveals the untenable nature of petitioner's position. The rate at which the Republic policyholders were actually lost shows a random variation to which we can ascribe no pattern to determine a useful life of the policies. Petitioner's evidence is a far cry from the evidence of a determinable period of usefulness as was found to exist in *Manhattan Co. of Virginia, Inc.*, 50 T.C. 78 (1968), and reflects perhaps an inherent obstacle to the amortization of cancelable health and accident policies. Under the foregoing circumstances, section 167 and the regulations thereunder [6] operate to deprive petitioner of a deduction for amortization of intangibles under section 832(c)(10).[7]

Petitioner makes the further argument that all or a portion of the consideration should be allocated to Republic's covenant not to compete, thereby allowing a complete or partial write-off during the 2 years of the covenant. While the agreement makes no allocation on its face, petitioner requests that we apply the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), modifying 11 B.T.A. 743 (1928), to make an appropriate allocation. We find no indication, however, that the value of the Republic policies to petitioner was limited to the period of the covenant not to compete. The purpose of the covenant was to assure petitioner the benefit of the bargain, but the record contains no suggestion that the covenant was a prerequisite or even conducive to petitioner's securing that benefit. Republic was insolvent and barred from carrying on an insurance business in Kentucky at the time of transfer. There was thus little likelihood that Republic would again become an active company and Republic did not, in fact, reenter the health and accident field. The suggestion that policies would become valueless to petitioner, if Republic became a competitor at the expiration of the covenant, is based on the assump-

---

[6] Sec. 1.167(a)–3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * *

[7] (c) DEDUCTIONS ALLOWED.—In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:

* * * * * * *

(10) deductions (other than those specified in this subsection) as provided in part VI of subchapter B (sec. 161 and following, relating to itemized deductions for individuals and corporations) and in part I of subchapter D (sec. 401 and following, relating to pension, profit-sharing, stock bonus plans, etc.) ;

tion that Republic's former policyholders would again insure with Republic. In light of the knowledge of Republic's insolvency and tendency of policyholders to remain with the same insurer, we attribute scant substance to this possibility. See *Commissioner* v. *Killian*, 314 F. 2d 852 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court; *Edward A. Kenney*, 37 T.C. 1161 (1962). In short, any value which the covenant had for petitioner was too remote to be severable from the consideration paid for the assets acquired. The covenant was an integral part of the reinsurance agreement and served only to provide petitioner with an additional degree of assurance that it would have the maximum opportunity to profit from the business it was purchasing. *Commissioner* v. *Killian, supra; Alfred H. Thoms, supra; Merle P. Brooks*, 36 T.C. 1128 (1961); *Aaron Michaels*, 12 T.C. 17 (1949); cf. *Winchell Co.*, 51 T.C. 657 (1969).

*Decision will be entered under Rule 50.*