W. WALLEY, INC., Respondent, v. SAKS & COMPANY, Appellant.

First Department, May 21, 1943.

*Leonard P. Moore* of counsel (*James N. Buckner* with him on the brief; *Chadbourne, Wallace, Parke & Whiteside,* attorneys), for appellant.

*Menahem Stim* of counsel (*Samuel Randel* with him on the brief; *Blake, Stim & Curran,* attorneys), for respondent.

GLENNON, J. Plaintiff, shortly after it was organized in September, 1935, entered into an arrangement with the defendant for the opening of a purchasing agent's charge account in its Thirty-fourth Street store in New York City, whereby plaintiff's customers were permitted to make purchases of merchan-

dise on its credit. Plaintiff was entitled to a credit discount of ten per cent of the total amount of such purchases. Its list of customers was acquired at the outset, in the main, from a personal following of plaintiff's president, Marks John Waldbaum. In preparing its list, the plaintiff hired solicitors, some on a regular salary basis and others on commissions. A person who wished to open a charge account through plaintiff was required to sign an application blank. The information therein set forth was checked by plaintiff through Credit Bureau of Greater New York and Retailers Commercial Agency, as well as by plaintiff's employees. The expense of the investigation was borne solely by plaintiff.

If the account was approved, the customer would be given an identification card which was recognized by defendant. This card bears the identification number, the name of the customer with the name of the plaintiff underneath. Incidentally, it might be remarked that between the time plaintiff was organized in 1935 and the time of trial, plaintiff had on its books between twenty-seven and twenty-eight thousand names. In March, 1942, the number of the active accounts of its customers ranged between fifteen and eighteen thousand.

The purchases in the first instance were charged by defendant directly to plaintiff. Ordinarily, plaintiff's customers gave their names, identification number and frequently their addresses to defendant.

Over the course of a period of about six and one-half years, the total purchases made by plaintiff's customers at the Thirty-fourth Street store of defendant amounted to $532,767.94. Plaintiff paid the amounts making up this total sum, less the ten per cent discount. Plaintiff furnished security originally in the sum of $500 to cover these accounts. The amount was later increased, at the request of the defendant, in December, 1936, to $1,000. Furthermore, in 1937, a guaranty of payment was delivered to the defendant and later, in April, 1938, a second guaranty of payment executed by M. J. Waldbaum and Janet L. Waldbaum, as individuals, was given to the defendant. There is no claim made by defendant that over the period of time plaintiff and defendant were engaged in this joint enterprise, plaintiff at any time failed to carry out its part of the agreement. It might be remarked that the arrangements were made by one Thomas F. Higgins, who at that time was defendant's credit manager. It cannot be gainsaid that the defendant adopted the agreement since it placed its stamp of approval on it, ratified it and benefited by it for a long period of time.

It has been found by the Trial Justice that the parties agreed that, in the event either wished to terminate this arrangement, six months' notice would be given by the party who desired to do so. There does not seem to be any dispute between the parties that the customers who used plaintiff's credit cards were regarded as plaintiff's customers. In fact, Mr. Waldbaum testified that in his discussion with Mr. Higgins concerning this point, the latter said: "Of course, they are your customers. Saks is no Samaritan. Where would we come off delivering — giving you 10 percent, if these customers were ours now? Wouldn't we be crazy?"

The agreement entered into between plaintiff and the defendant was carried out until the month of March, 1942. About March 24th, Mr. Waldbaum was requested by Allen F. Jaquith, who was treasurer and comptroller of defendant, to attend a luncheon with him and Milton Baker who had succeeded Mr. Higgins as credit manager of the defendant. During the course of the luncheon, according to Mr. Waldbaum, Mr. Jaquith said in part: "Mr. Waldbaum, I have some really bad news for you."

Mr. Waldbaum further testified that thereafter the following conversation took place: "He said that Mr. Blum, the vice-president and executive director of the store, had given him orders to discontinue all purchasing agents, and letters were going out in the mail that day; I would receive it in the next morning's mail. And I was astounded when I heard the news, and I turned to him and said, ' I think you have made a terrible mistake.' I said, ' I really feel that Saks 34th Street is going to lose an appreciable volume of business through that decision.' He said, ' Oh, we don't think we are going to lose much business because, frankly, we are going after your accounts.' When he said that, I said, ' Mr. Jaquith, if you do that, I certainly think it would be wrong. It looks unethical, and, in fact, it is crooked.' He said, ' Well, I have nothing to say about that. The decision comes from Mr. Blum, and those are my orders, and we have to follow them out — follow them through.' " Mr. Jaquith then asked for permission to use plaintiff's accounts. Mr. Waldbaum testified that he made the following reply: " I have spent thousands of dollars building up — getting that business, building it up. Don't you think it is crooked for you to even suggest that thought? I can't give you my permission. I won't give you my permission."

While Mr. Jaquith disputed the statement of Mr. Waldbaum concerning the six months' cancellation notice, when called as

a witness by the defendant, he said in part: " He asked me if I was, or if we, rather, were going to solicit his customers, as he called them, and I said, ' Mr. Waldbaum, we feel that these people are equally our customers as much as yours.' He said, in essence, that he thought if we solicited those customers, it was a crooked thing to do."

The correspondence between the parties indicated quite conclusively that the defendant even as late as March 24, 1942, regarded that the customers who came to them through the plaintiff were in fact plaintiff's customers.

We are in accord with the view as expressed by the Trial Justice that: " The names of plaintiff's customers constitute a part of plaintiff's good will; defendant recognized that they were plaintiff's customers. Consequently, defendant was not justified in weaning them away from plaintiff in the manner pursued." In fact, a number of plaintiff's customers were immediately notified by letter from the defendant that charge accounts had been opened by it for them. By way of illustration of the tactics resorted to by defendant, a letter dated March 31, 1942, which was sent to one of plaintiff's customers, is herein set forth: " Because we believe that we can serve you better through a Saks-34th charge account, we have taken the liberty of opening an account for you.

" You will now receive notices of sales and special events which are sent exclusively to our charge customers. All of our various credit facilities are at your disposal with no red tape. When you want to buy a new coat or suit, our Convenient Payment Plan will give you months to pay. When Easter and the Holidays Seasons come around, our Convenient Payment Coupon Account will enable you to pay for these purchases over a period of months.

" Most important is our desire to have you feel that Saks-34th is your store and that you can count on us to give you that additional measure of service to which you are entitled as one of our Charge customers.

" Please feel free to call upon me personally at any time if I can be of special service to you. Remember, your account is now open for you to use whenever you wish to say ' charge it ' to any sales-clerk in our store.

Very truly yours,

M. K. Baker,

M. K. Baker

Credit Manager of Saks-34th."

Of course, the purpose was apparent. The underlying idea was to deprive plaintiff of its ten per cent commission. Defendant naturally felt secure in extending credit to plaintiff's customers, since plaintiff had expended large sums of money in investigating their credit.

We are impelled to follow the opinion of the Trial Justice wherein he stated: " In the circumstances, I find myself unable to subscribe to the doctrine urged by the defendant, that the broad and elastic powers of equity afford no remedy."

Defendant should not be permitted to take advantage of the knowledge it acquired of the names of plaintiff's customers at the expense of the plaintiff, where it would not have obtained those names without having entered into the arrangement for the opening of plaintiff's charge account.

Mr. Justice WHEELER in *Witkop & Holmes Co.* v. *Boyce* (61 Misc. 126, affd. 131 App. Div. 922) expressed this thought when he said, in part: " * * * The names of the customers of a business concern whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good-will of a business which enterprise and foresight have built up, should be deemed just as sacred and entitled to the same protection as a secret of compounding some article of manufacture and commerce." While that case involved the question of employer-employee relationship, still the principle can be applied with equal force to the situation here presented.

This case involves a species of unfair competition. As pointed out by the Trial Justice, plaintiff has at considerable expense built up a certain good will. Defendant by its action seeks to destroy it. Without compensation to the plaintiff, it believes it has the right to appropriate to its own use the names of plaintiff's customers. That is not fair, just or ethical.

The reasoning followed by Mr. Justice PITNEY in *International News Service* v. *Associated Press* (248 U. S. 215) applies here. There he said in part: " Obviously, the question of what is unfair competition in business must be determined with particular reference to the character and circumstances of the business. The question here is not so much the rights of either party as against the public but their rights as between themselves. See *Morison* v. *Moat*, 9 Hare, 241, 258. And although we may and do assume that neither party has any remaining property interest as against the public in uncopyrighted news matter after the moment of its first publication, it by no means follows that there is no remaining property interest in it as between

themselves. For, to both of them alike, news matter, however little susceptible of ownership or dominion in the absolute sense, is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise. * * *.

" In order to sustain the jurisdiction of equity over the controversy, we need not affirm any general and absolute property in the news as such. The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right; [citing cases] and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. [Citing cases.] It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition."

A careful examination of the injunctive provisions which appear in the interlocutory judgment would lead one to the conclusion that appellant's argument that they are too drastic is not well founded. Plaintiff's customers are not restrained from making purchases at defendant's store. Defendant is enjoined from soliciting plaintiff's customers or voluntarily opening charge accounts for them without a prior request of the customer. The plaintiff concedes that any person whether the holder of a Walley card or not, may of his or her own volition enter the defendant's store to do business whether paying for the same in cash or on a charge account basis voluntarily requested by such customer.

The filing of the list of plaintiff's customers as provided for in the interlocutory judgment would seem to be proper since plaintiff certainly does not wish to disclose the names of all its customers to the general public or to its competitors. It will be necessary for the referee to check the list of plaintiff's customers with those who were in fact plaintiff's customers and as a result thereof made purchases in defendant's store. The records which undoubtedly were kept by the defendant of sales made to those particular customers should be available. Where, of course, defendant did not come in contact with plaintiff's customers by virtue of the business arrangement entered into with plaintiff, the injunctive provisions would not apply.

Under the circumstances, the judgment appealed from should be affirmed, with costs.

MARTIN, P. J. (dissenting in part in the following memorandum). The accounting period should be limited to six

months from April 4, 1942. (See *Sallinger* v. *Conrad & Co., Inc.,* 242 Mass. 58.)

TOWNLEY, COHN and CALLAHAN, JJ., concur with GLENNON, J.; MARTIN, P. J., dissents in part in memorandum.

Judgment affirmed, with costs.