ALFRED H. THOMS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3426–66. Filed May 7, 1968.

*Michael J. Mehr*, for the petitioner.
*Ralph F. Keister*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in petitioner's income tax for the years 1961 and 1962 in the respective amounts of $698.49 and $4,275.70.

The issue is whether the insurance customer list, or as we will sometimes call it, the list of expirations, which was included in petitioner's purchase of a going insurance business can be the subject of a depreciation allowance under section 167(a)(1), I.R.C. 1954.[1]

FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Petitioner was a resident of Detroit, Mich., at the time his petition herein was filed. He filed his Federal income tax returns for 1961 and 1962 with the district director of internal revenue at Detroit, Mich.

---

[1] Unless otherwise stated, all Code references hereinafter shall be to the Internal Revenue Code of 1954.

Petitioner is engaged in the business of selling fire, casualty, and life insurance. Since 1951, he has devoted his full time to the insurance business, trading as the Alfred H. Thoms Insurance Agency and servicing customers in the Detroit, Mich., area.

In 1961 petitioner negotiated for the purchase of an insurance agency that was owned and operated since 1957 by Philip F. Pierce in conjunction with his real estate appraisal business under the assumed name of Pierce-Foster & Co. in St. Clair Shores, Macomb County, Mich. In the course of the negotiations, petitioner learned that Pierce wanted to sell his insurance business and concentrate all of his energies on the real estate work.

On September 22, 1961, petitioner and Pierce agreed on a sales price of $10,500 and executed a written agreement which provided, in part, as follows:

WHEREAS, the Seller owns and operates a general insurance agency business in the City of St. Clair Shores, under the assumed name of Pierce-Foster & Company, and

WHEREAS, the Purchaser desires to purchase from the Seller the general insurance agency business, as a going concern, exclusive of cash and accounts receivable and free of any obligations for accounts payable or other liabilities of the Seller,

Now, THEREFORE, IT IS AGREED AS FOLLOWS:

1. *Sale of Business.* The Seller shall sell to the Purchaser the general insurance agency business owned and operated by the Seller at 25815 Harper Avenue, St. Clair Shores, Michigan, as a going concern, free and clear of all liens and encumbrances, including: the goodwill of the agency; all records, customers lists and correspondence, files, and work in process at the date of closing; and, subject to the provisions of Paragraph 5, all contracts, all expiration files, and all other documents and instruments pertaining to the clients of the agency and all contracts and other documents between the agency and insurance companies, now utilized in the operation of the said general insurance agency business.

\*    \*    \*    \*    \*    \*    \*

5. *Contracts.* The Purchaser acknowledges that the Seller has made no representations with respect to contracts, arrangements, and insurance programs with the clients of the Seller, or with respect to contracts, arrangements, and insurance programs between the Seller and the insurance companies represented by the Seller. The Purchaser assumes the risk that all such contracts, arrangements and insurance programs may be canceled at will and without notice, subject to the terms of existing contracts, either by the clients of the Seller or by the insurance companies represented by the Seller. Nor has the Seller made any representation that any of these contracts, arrangements, or insurance programs are assignable.

6. *Purchase Price.* The purchase price for all the assets referred to in Paragraph 1 is Ten Thousand Five Hundred ($10,500.00) Dollars, all of which is attributable to the goodwill, expiration files, and all other intangible assets of the Seller. \* \* \*

\*    \*    \*    \*    \*    \*    \*

8. *Name of Agency Business.* From and after the date of closing, the Purchaser shall have the exclusive right to use the name "Pierce-Foster Agency" and to use the names "Pierce" and "Foster" either alone or in combination with any

other word or words, as a sole proprietor, in a partnership or as a corporation; provided, however, that Seller reserves and Purchaser shall not be permitted to use the designation and name "Pierce-Foster & Company".

9. *Value of Agency Business.* Subsequent to the date of execution of this Agreement and prior to the date of closing, the Purchaser shall have the right to examine the files and records of the Seller in order to ascertain the value of the agency business being sold pursuant to this Agreement. Seller represents that his gross annual premiums total Forty-five Thousand ($45,000.00) Dollars and that his gross average commission is twenty (20%) percent of the gross annual premiums, or Seven Hundred Fifty ($750.00) Dollars per month. The selling price of the agency business being sold pursuant to this Agreement has been established as fourteen (14) times the average monthly commission of Seven Hundred Fifty ($750.00) Dollars, totaling Ten Thousand Five Hundred ($10,500.00) Dollars. If, upon examination of the files and records of the Seller, the Purchaser shall ascertain to the satisfaction of the Seller that the Seller's files and records do not properly reflect the value of the insurance agency business being sold pursuant to this Agreement, as hereinabove represented, then, and in that event, the purchase price for the agency business being sold pursuant to this Agreement shall be reduced by a sum proportionate to the percentage by which the value of the gross annual premiums, as represented herein, exceed the gross annual premiums, as ascertained by Purchaser upon examination of the files and records of Seller, and as agreed to by Seller.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

11. *Notifications.* On or after the date of closing, the Purchaser shall send a letter, prepared by Purchaser but to be signed by Seller on Seller's stationery, to all of Seller's insurance clients notifying said clients that Seller's insurance agency has become associated with Purchaser's insurance agency. Seller shall also forthwith upon closing, notify all insurance companies with which he is doing business as of that date, that his insurance agency business has been sold to Purchaser. Seller shall assist Purchaser, if so desired by Purchaser, in making application to Seller's insurance companies with which Seller is doing business as of the date of closing, for representation by Purchaser.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

13. *Covenants of Seller.* For a period of [Five (5)] [2] years from the date of closing, the Seller shall not:

(a) Canvass, solicit, or accept any business for any other insurance agency, from any present or past clients of the agency.

(b) Give any other person, firm, or corporation the right to canvass, solicit, or accept any business for any other insurance agency, from any present or past clients of the agency.

(c) Directly or indirectly request or advise any present or future clients of the agency to withdraw, curtail, or cancel his business with the agency.

(d) Directly or indirectly disclose to any other person, firm, or corporation the names of past, present or future clients of the agency.

(e) Directly or indirectly induce, or attempt to influence, any employee of the agency to terminate his employment.

(f) Directly or indirectly engage in the insurance business in the City of St. Clair Shores, and Wayne, Oakland and Macomb Counties in the State of Michigan, either as an employee, proprietor, partner or stockholder.

---

[2] This provision of the contract was changed by a handwritten notation initialed by petitioner and Pierce. The words "Five 5 years" were substituted for "three (3)" which appear in the typed document.

A "Supplemental Agreement," executed by the parties on September 30, 1961, amended the agreement of September 22, 1961, by adding the following provision: "*Employment of Seller*. The Purchaser will employ the Seller, * * * at Seller's option, as a solicitor in the insurance agency business which is being sold pursuant to this agreement." On the same date, petitioner signed a written certification that he had examined Pierce's records and files pursuant to paragraph 9 of the agreement and that "the value of the insurance agency business being sold" is reflected in gross annual premiums of $45,000 and gross average monthly commissions of $750.

The $10,500 purchase price was arrived at by multiplying the average monthly commissions ($750) by 14 months. Initially, Pierce desired a formula based on an 18-month rate while petitioner bargained for a 12-month rate. The parties compromised this item, agreeing on a 14-month rate which resulted in the $10,500 price.

Petitioner purchased the insurance agency business as a going concern. Petitioner did not purchase or receive any of Pierce's fixtures or furniture. None of Pierce's employees worked for petitioner after the purchase and Pierce did not transfer his telephone exchange to petitioner. Pierce continued his real estate business at the same business location and under the same name (Pierce-Foster & Co.) as were used for his combined insurance-real estate business prior to the sale. However, after the sale to petitioner, Pierce no longer engaged in the insurance business.

The customer list petitioner received consisted of 16 pages containing information regarding approximately 509 different policies—in many cases, two or more policies were written for the same customer. On each page there were seven columns across the top so that a typical entry on the list appeared as follows:

| | | | Period | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Ins. company | Insured's name | Type of policy | Effective | Expiration | Gross premium | Commiss. percent |
| * * * | * * * | Fire | 7/20/59 | 7/20/62 | $65.07 | 25 |

Nine of the accounts on the list were lined out and marked "[Yates]." These accounts belonged to a solicitor employed by Pierce; petitioner returned these accounts to this solicitor after the purchase.

Some of the policies on the list had already expired by the date of purchase and others were not scheduled to expire until as late as 1966.

A form letter, dated October 9, 1961, and signed by petitioner and Pierce, was sent to each customer on the list. It was prepared by Pierce on a Pierce-Foster & Co. letterhead bearing the engraved name, telephone numbers, address, and, in a diamond-shaped frame, the mark

"P–F & Co." associated with Pierce's business. The letter stated as follows:

DEAR CUSTOMER AND FRIEND,

We are pleased to announce that Pierce-Foster Insurance has been merged and consolidated with the Alfred H. Thoms Insurance Agency.

The new firm name is PIERCE–THOMS INSURANCE AGENCY with offices at 5768 Whittier near Harper Avenue, Detroit, Michigan. The new telephone numbers are *TU 1–2376* or *881–2376*.

By a consolidation of the two agencies representing many large and well known insurance companies, we can provide even better service for you and a complete insurance center for our many customers.

Mr. Thoms has served the public in the insurance industry for the past fourteen years as owner of the ALFRED H. THOMS INSURANCE AGENCY and he will continue in his endeavor to maintain and secure an attitude of "friendly service" toward you. His experience is extensive and he welcomes the opportunity of solving your insurance problems and satisfying your many insurance needs.

Mr. Pierce will serve as an adviser and counsellor for the new organization.

We heartily appreciate having you as a loyal customer of ours, and we have appreciated your many recommendations of us to others, also.

We sincerely hope that our service in the past has pleased you, too, and we certainly will continue to strive to see that our service in the future goes well beyond fulfilling your policy contracts.

Thanking you, we remain,

Sincerely yours,

In addition, petitioner and Pierce sent a form letter to each of the insurance companies associated with Pierce, notifying them of petitioner's purchase of the business. This letter, dated October 2, 1961, stated as follows:

This is to advise you that I have sold my insurance agency with renewal rights being transferred to Alfred H. Thoms. Mr. Thoms will begin renewing the November accounts and will have full rights to the renewal business and the obligation to pay for the renewals ordered. This includes the rights to receive the commission on any direct billing contracts.

It shall be my responsibility to pay for all policies ordered up to and including October 31, 1961.

Mr. Thoms will be responsible for any annual installments due on insurance policies issued at any time by our agency.

Petitioner already represented 6 of the approximately 18 insurance companies to which the letters were sent. After the sale, he applied for and received agency licenses with 4 of the 12 which he did not already represent. However, his agreements with 3 of these companies were terminated on December 31, 1962, and, with the fourth, in March of 1964.

After the purchase, petitioner used the list as planned by making telephone contact with some of the policyholders and by direct billing

to others. Some of the customers renewed their policies and others did not. Also, some of the customers on the list were customers of petitioner on December 5, 1967—the date of trial.

In his Federal income tax return for 1961, petitioner reported gross receipts from his insurance agency business in the amount of $19,519.51. In 1962, his reported gross receipts from the insurance business were $25,545.40.

Petitioner treated the full cost of the purchase as attributable to the customer list. He attempted to amortize the amount paid on the straight-line method over a 14-month period, claiming depreciation deductions in 1961 and 1962 in the amounts of $1,500 and $9,000, respectively.

In his notice of deficiency, respondent disallowed any deduction for the cost of purchasing the customer list.

OPINION

The only issue here is whether petitioner is entitled to an allowance for depreciation with respect to the list of expirations received by petitioner in the purchase of the insurance agency business. Section 167(a) allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (1) of property used in a trade or business, or (2) of property held for the production of income." The regulations under this section provide, in pertinent part, as follows:

Sec. 1.167(a)–3    Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

Petitioner had the burden of proving that the intangible asset he purchased, namely the list of expirations, had a limited and determinable useful life in his business. *Thrifticheck Service Corporation*, 33 T.C. 1038, affd. 287 F. 2d 1, 3, 4 (C.A. 2, 1961). If it is the type of asset which has a continuing value in the business lasting until an indeterminate time in the future it is not subject to a depreciation allowance. *The Danville Press, Inc.*, 1 B.T.A. 1171 (1925); *National Weeklies* v. *Reynolds*, 43 F. Supp. 554 (1942).

Petitioner argues that the entire purchase price was attributable to the list of expirations, that the list had a definite and determinable useful life and that he is therefore entitled to amortize the cost "over

a period not in excess of two (2) years." In the alternative, petitioner contends that the expiration of the 5-year covenant not to compete given by Pierce ends the useful life of the list of expirations so that the amount paid for the list is amortizable over a 5-year period. Respondent maintains that the list of expirations is in the nature of goodwill and, like goodwill, is not subject to amortization in that it has an indeterminate useful life or, in any event, that petitioner presented no evidence as to a limited useful life so that no depreciation can be allowed.

In *Vaaler Insurance, Inc.* v. *United States* (D. N.Dak. 1968, 21 A.F.T.R. 2d 558, 68–1 U.S.T.C. par. 9183), the taxpayer purchased an insurance business including the list of expirations. The court held no goodwill was transferred so the whole purchase price was allocated to the list of expirations which, the court held, could be amortized over 5 years. In the course of the opinion the court stated:

The value of the files and expirations acquired is short-lived in nature * * * their only value to the taxpayer is the information contained therein which enables plaintiff and its agents to renew the policies at the expiration thereof. This information becomes obsolete, however, when the policyholders die, move out of town, sell property which is insured, or otherwise cancel or become uninsurable.

In *Stewart* v. *United States* (N.D. Okla. 1965, 16 A.F.T.R. 2d 5604, 65–2 U.S.T.C. par. 9607) the court held the portion of the $30,000 purchase price for purchase of an insurance business that should be allocated to the list of expirations was $1,000. The other allocations were: for furniture and fixtures $3,500; goodwill $1,500, and 5-year covenant not to compete $24,000. The court held the portions allocated to the list of expirations and the covenant not to compete ($1,000 and $24,000) could be depreciated over 5 years.

In *Weaver* v. *United States* (W.D. Okla. 1965, 15 A.F.T.R. 2d 1703, 65–1 U.S.T.C. par. 9410) the seller retained his life and health and accident insurance business but sold the fire and casualty records including list of expirations of his general insurance business and gave a 5-year covenant not to compete in such insurance business, all for $32,060. The court held the list of expirations purchased was a "wasting asset"; that there was no purchase of goodwill and the purchaser could deduct annually the commissions he received on renewals of policies issued by the seller until his entire cost was recovered.

In *Williamson & Waite, Inc.* v. *United States* (S.D. Ind. 1961, 9 A.F.T.R. 2d 337, 62–1 U.S.T.C. par. 9163) the insurance business was purchased for $25,000. The court held $18,750 should be allocated to the 5-year covenant not to compete. The court held the records including the list of insurance in force (expirations) "had no market value alone" but such records "derived value exclusively from the

covenant not to compete" and the $18,750 allocated to the covenant could be depreciated over 5 years.

The case of *Wikle* v. *United States* (N.D. Ala. 1965, 15 A.F.T.R. 2d 949, 65–1 U.S.T.C. par. 9403) involved the sale of daily reports or list of expirations of an insurance business, and the claim by the seller, that the amount paid therefor was subject to depreciation. The case was tried to a jury. In directing the verdict for the Government the court held the useful life of the list of expirations was unlimited.

There are many cases expressing the close connection between an insurance expiration list and goodwill. See *V. L. Phillips & Co.* v. *Pennsylvania Threshermen, etc.*, 199 F. 2d 244, 246 (C.A. 4, 1952), where, in a suit involving the construction of an agency agreement between an insurance company and its general agent, the court stated that the expiration list "has become, in the insurance field, recognized as a valuable asset in the nature of good will." Similar expressions of the close association between insurance expiration lists and goodwill are contained in tax cases where the issue was whether capital gain or ordinary income attached to the sale of the insurance expiration list of a going business. See *George J. Aitken*, 35 T.C. 227 (1960) ; *Edward A. Kenney*, 37 T.C. 1161 (1962) ; and *Commissioner* v. *Killian*, 314 F. 2d 852 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court.[3]

There is no evidence in the record to substantiate petitioner's claim on brief that the list of expirations had a definite and determinable useful life. Nowhere in the record does petitioner attempt to show that the period of 2 years or 5 years or any other period is a reasonable estimate of the useful life of the list. In the only testimony offered by petitioner on this point, petitioner said:

the list I have in my hand would serve no purpose to me after the customer was approached, and after it was determined whether he would be willing to reinsure with me or not. A new policy may be written with a different premium shown, it may have been a different company. A new contract would go out to him with my advertising on it, so the list would serve no purpose to me after the former policy had expired.

Petitioner's unsupported and generalized conclusion falls far short of the proof which is required in this instance. The regulation quoted above provides that "No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life."

---

[3] Petitioner relies heavily upon a Memorandum Opinion of this Court (*Savings Assurance Agency, Inc.*, T.C. Memo. 1963–52), where it was held under the special facts of that case that no goodwill existed in the sale of an insurance expiration list from the estate of a deceased sole proprietor of an insurance agency and the list had a determinable useful life. The opinion recognizes the result would be otherwise if there was any goodwill existing to which the expiration list could attach.

There is evidence offered by respondent that the list did not have a definite limited life. Pierce was called as a witness by respondent and he was asked how long the customer list would be of aid to a purchaser. He answered:

They would have an indefinite value from the standpoint that it would permit the user to renew the next contract; and if for one reason or another he was not able to, it would also at least give him an edge or inside, as to when subsequent contracts would expire, even though he might have not renewed the most recent renewal contract.

Petitioner contends that the remaining policy periods reflected on the list should measure the useful life of the list because, after the initial contact with a customer near the policy expiration date, only petitioner's "efforts, goodwill, and skill provided any further contact or business."[4] It appears, however, that the value and usefulness of the list continued long after the listed policies were scheduled to expire. Petitioner admitted that at the time of trial he was still servicing customers on the list. This was more than 6 years after the date of purchase and over a year after the latest of the listed expiration dates.

Petitioner makes a separate argument with respect to the covenant not to compete. He does not claim that the covenant not to compete was treated in a separate and severable manner in respect to value and cost so that some portion of the $10,500 purchase price could be attributed to the covenant and amortized pro rata by annual deductions over the life of the covenant. His argument on brief is: "The expiration of the term of the covenant not to compete with Petitioner must mark the ultimate useful life of the customer list purchase as the value and usefulness of the list was then most clearly exhausted."

Such a covenant not to compete is a normal incident to the purchase of an insurance business including the list of expirations. It is obvious such a covenant has the function primarily of assuring the purchaser the beneficial enjoyment of the goodwill and the seller's list of expirations. But that does not mean the list became worthless when the seller could if he wished reenter the insurance business in the same territory. It would be unreasonable to assume that after a 5-year period

---

[4] In a recent Memorandum Opinion of this Court (*John T. Fletcher*, T.C. Memo. 1965–273), where we held against the taxpayer on the issue presented here, the same argument was presented and rejected. In the course of the opinion we stated:

"The fallacy of petitioners' argument is patent. They are under the misconception that after the expiration information has been used for the first time it becomes valueless, whether there is a renewal or the business is lost. Apparently they believe that once a policy was renewed the expiration information was no longer part of the list purchased from White but somehow became merged in their own business. Such is not the case. The benefits inuring to petitioners from White's customer list, whether in the nature of renewals or referrals, remain attributable to that list. The expiration information is useful at each renewal, not just the first. Thus, it is plain to us that an insurance expiration list, purchased together with goodwill and a covenant not to compete, does not have a determinable useful life."

of doing business with the listed policyholders without competition from the seller he would be totally cut off from future benefits the day the seller is free to start up again in the insurance business.[5] The presence of the 5-year covenant not to compete does not make the useful period of the list of expirations definite. The value of the list is not exhausted on the date when the seller can resume the insurance business.

We are of the opinion that under the facts of this case the list of expirations is so inextricably linked with goodwill that it could not possibly have a separate depreciable existence. We have here the transfer of a going insurance agency business and its goodwill. Any definition of goodwill includes the concept of the advantage that the proprietor of an existing business enjoys resulting from the probabilities that old customers will continue their patronage.[6] Surely goodwill in the insurance agency business encompasses the advantage that the agency has, that its policyholders will renew their expiring policies. It is difficult to see how any insurance agency could transfer its goodwill without delivering its insurance expiration list to the transferee. If the list is not given to the transferee of goodwill he receives no benefit in the form of a probability that the policyholders of the old business will renew with him, which is just another way of saying he did not get the goodwill. If the list is delivered to the transferee of goodwill it merely accomplishes the transfer of the goodwill—defined to be the benefit that he will probably secure the renewals. The transfer of a list of expirations of a going insurance agency business is merely implementing the transfer of goodwill. *W. Walley, Inc.* v. *Saks & Co.*, 41 N.Y. S. 2d 739. It is furnishing the transferee with records that will give him the opportunity to succeed to the advantageous position of his transferor. In our opinion the list of expirations is an integral part of the goodwill of a going insurance agency business.

Under the Commissioner's regulation (sec. 1.167(a)–3) no deduction for depreciation is allowable with respect to goodwill. Goodwill has no determinable useful life. It will continue to serve the purchaser as long as he continues the business. *X–Pando Corporation*, 7 T.C. 48. So, too, the list of expirations of a going insurance agency business, which is a component part of goodwill, has no determinable useful life. It, too, will serve the purchaser as long as he continues the business.

We hold for respondent on the issue presented.

*Decision will be entered for the respondent.*

[5] There is much authority for the proposition that where a going business, including goodwill, has been transferred, the grantor is under a duty not to solicit the patronage of his old customers. See "An Inquiry into The Nature of Goodwill," 53 Col. L. Rev. 671. See also *In re Brown*, 242 N.Y. 1, 10, 150 N.E. 581, 584 (opinion by Judge Cardozo) : "After a voluntary sale, [of the goodwill] the seller, though he may compete, may not drum up or circularize the customers of the business." See also 24 Am. Jur., Goodwill, sec. 23, p. 817 ; *J. L. Cooper & Co.* v. *Anchor Securities Co.*, 9 Wash. 2d 45, 113 P. 2d 845.

[6] See Notes, 8 Tax L. Rev. 96 ; *Jackson* v. *Caldwell*, 415 P. 2d 667.