Meyer Morris and Arlene D. Morris v. Commissioner.
Morris v. Commissioner
Docket No. 407-68.
United States Tax Court
T.C. Memo 1968-295; 1968 Tax Ct. Memo LEXIS 5; 27 T.C.M. (CCH) 1558; T.C.M. (RIA) 68295; December 26, 1968, Filed Meyer Morris, pro se, 270 List Ave., Rochester, N. Y. David H. Julian, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies against the petitioners for the taxable years 1963 and 1964 in the amounts of $420.23 and $1,361.40, respectively. Two issues are presented for decision: (1) Whether petitioner Meyer Morris is entitled to a depreciation deduction under section 167, Internal Revenue Code of 1954, [1] in each of the years 1963 and 1964 with respect to assets received by him in purchasing all or part of insurance agency businesses; and (2) whether petitioner is *6 entitled to a depreciation deduction for covenants not to compete contained in the purchase agreements of the insurance agency businesses where no amounts were specifically allocated to the covenants. Certain other adjustments made by respondent for the year 1964 are not contested by petitioners. 1559 Findings of Fact Some of the facts have been stipulated by the parties and are found accordingly. Meyer Morris and Arlene D. Morris, the petitioners herein, are husband and wife whose legal residence was Rochester, New York, at the time of filing their petition in this proceeding. Their joint Federal income tax returns for the year 1963 and 1964 were filed with the district director of internal revenue at Buffalo, New York. In June 1960, Meyer Morris (herein called petitioner) was employed as manager of the Uhl Insurance Agency in Rochester, New York. On May 17, 1963, petition entered into an agreement with Norman T. Uhl to purchase the Uhl Insurance Agency for $36,000. The agreement provided, in pertinent part, as follows: AGREEMENT Made this 17th day of May, *7 1963, by and between NORMAN T. UHL of 63 Inglewood Drive, Rochester, New York, party of the first part, and MEYER MORRIS, of 161 Biltmore Drive, Town of Irondequoit, New York, party of the second part. Whereas, the party of the first part and the party of the second part entered into a written agreement dated June 3, 1960, concerning a general insurance agency at 1219 Granite Building, Rochester, New York, owned by the party of the first part, Norman T. Uhl, and known as the Uhl Insurance Agency; and Whereas, pursuant to the said agreement, the party of the second part was employed by the party of the first part as manager of said agency, and it was further agreed that the party of the second part was to purchase said agency business at the end of the term of said agreement, which expires on April 17, 1965; and Whereas, the party of the second part, Meyer Morris, desires to purchase the said agency business, including all office equipment, furniture and supplies, as of July 1, 1963; NOW, THEREFORE, WITNESSETH, in consideration of the mutual covenants and agreements herein contained, the parties do hereby agree as follows: 1. The party of the second part, Meyer Morris, hereby *8 agrees to purchase the insurance business known as the Uhl Insurance Agency, now being conducted at 1219 Granite Building, Rochester, New York, together with the good-will incidental thereto, including all office equipment, furniture and supplies, for the sum of Thirty-six thousand dollars ($36,000.00), payable as follows: Five hundred dollars ($500.00) in cash upon the signing of this agreement; and Five thousand five hundred dollars ($5,500.00) in cash on July 1, 1963; and the balance namely, Thirty thousand dollars ($30,000.00), to be paid Three thousand dollars ($3,000.00) semi-annually, the first payment to be on January 2, 1964, and continuing semi-annually thereafter. It is further agreed that the said Thirty thousand dollars ($30,000.00) shall be secured by notes signed by the party of the second part and his wife, Arlene D. Morris, said notes to be paid semi-annually, as heretofore stated. It is further agreed that in the event the party of the second part fails to make any payment within thirty (30) days after due date of any note, then the party of the first part, Norman T. Uhl, shall be entitled to the whole of said business, and the party of the second part agrees *9 to relinquish to the party of the first part any and all rights in said business, without expense or cost to the party of the first part. It is further agreed that in the event that the said party of the second part fails to make any of said payments, the said party of the second part, Meyer Morris, shall forfeit all rights and claims to any business that he may have brought in said business, and that no payment or commission shall be due to the party of the second part for any new business that he may have brought in. 2. It is further agreed between the parties hereto that in the event of the death of the party of the second part, Meyer Morris, and in the event that there still remains a balance due to the said party of the first part, Norman T. Uhl, then, in that event, it is agreed that the estate of said Meyer Morris shall have four (4) months from the date of his death to pay the balance of the purchase price of said agency; and it is further agreed between the parties hereto that in the event of the failure of the said estate to pay the balance of the said purchase price within the said period of four (4) months, then, in that event, the said business shall revert back to *10 the said party of the first part without cost or expenditure by him. 3. It is further agreed that in the event that the said party of the first part, Norman T. Uhl, should die, then said payments pursuant to this agreement shall be made to the estate of said Norman T. Uhl. 4. It is further agreed that the party of the first part will write all health and life business through the said Norman T. Uhl Agency. 1560 5. It is further agreed that the party of the second part will give to the party of the first part a chattel mortgage on all furniture and office equipment now on the premises or purchased at a later time by the said party of the second part. 6. It is further agreed between the parties hereto that the said party of the second part will not sell, assign on encumber said business until all of the purchase price is paid, without the written consent of the party of the first part. 7. It is further understood and agreed that the party of the second part shall have the right to use the name of Uhl Insurance Agency. 8. It is understood and agreed between the parties hereto that the closing is to be made at the office of Joseph Kaufman, Attorney, 1001 Times Square Building, *11 Rochester, New York on or before July 1, 1963. 9. It is understood and agreed that this agreement shall supersede agreement made by the parties hereto on June 3, 1960. Pursuant to the agreement of May 17, 1963, petitioner acquired a total of 1952 insurance expirations. Of these 1075 were life accounts. The remainder were health and accident accounts. In July 1963, petitioner entered into an agreement with Mohawk Valley Agency, Inc., a New York corporation having its principal place of business in Schenectady, for the purchase of a portion of Mohawk's business for $8,500. The agreement provides, in part, as follows: AGREEMENT This agreement, made the XX day of July, 1963, by and between the MOHAWK VALLEY AGENCY, INC., a corporation duly organized and existing under and pursuant to the Laws of the State of New York, having its office and principal place of business at 277 State Street, Schenectady 5, New York, hereinafter called the "Seller", and MEYER MORRIS, doing business at 1219 Granite Building, Rochester 4, New York, hereinafter called the "Buyer". WITNESSETH: WHEREAS, Seller is now engaged in business as an Agent and Broker for the solicitation of Fire, Casualty, *12 Inland and Ocean Marine Insurance, Fidelity and Surety Bonds, and Accident and Health and Life Insurance in the City of Schenectady and vicinity and at various parts of the State of New York, and WHEREAS, Seller has agreed to sell to the Buyer all right, title and interest in that portion of the business of the Seller as specifically defined herein: All Accident and Health and Life Insurance which was underwritten and issued by the Federal Life and Casualty Company of Battle Creek, Michigan, for which the Seller has been receiving commissions from the said Federal Life and Casualty Company, in force on the 31st day of July, 1963. WHEREAS, the aforesaid sale is subject to the following specific conditions: 1. Buyer shall pay to Seller therefor, the sum of Eight Thousand Five Hundred ($8,500) dollars as follows: a) One Thousand ($1,000) dollars prior to the execution of this agreement b) The sum of Seven Thousand Five Hundred ($7,500) dollars upon execution of this agreement. 2. Seller agrees to turn over to Buyer all records, cards, files and copies of correspondence pertaining to the aforesaid business. 3. Seller agrees that it will not, in relation to the aforesaid business, *13 solicit, canvass or replace such business, or permit or allow or give any other person, firm, association or corporation the right to solicit, canvass or replace such business, except to the benefit of the Buyer, or unless by written mutual agreement of both parties. 4. Seller agrees that all Life Insurance solicited or written by Charles O. McCreedy, President, will be first offered to the Federal Life and Casualty Company and placed through the Agency of the Buyer, for a period of not less than four (4) years. Seller further agrees to make every reasonable effort to induce those Life Insurance producers who are associated with it as independent contractors and licensed to sell Life Insurance in the Federal Life and Casualty Company on the 31st day of July, 1963, to likewise offer any such business to the Federal Life and Casualty Company through the Agency of the Buyer. 5. Buyer agrees to pay Seller the gross first year commission plus a sum representing 40% of the expense or acquisition allowance paid to the Buyer by the Federal Life and Casualty Company for any new Life Insurance produced by the Seller or Associates in accordance with paragraph #4. 6. Buyer agrees to pay *14 Seller the customary producer's commission for any Accident and Health business produced by Seller or Associates licensed to sell 1561 Accident and Health Insurance in the Federal Life and Casualty Company, for business now in force or written subsequent to the execution of this agreement. Charles O. McCreedy is specifically excluded from the provisions of this paragraph insofar as it relates to payment of commissions for Accident and Health Insurance now in force. 7. Buyer agrees to pay Seller or Associates concerned a commission of 5% for renewals of Life Insurance now in force as long as the Buyer receives the General Agent's commission on such business. Charles O. McCreedy is specifically excluded from the provisions of this paragraph insofar as it concerns the payment of renewal commissions on Life Insurance now in force. However, it is agreed that Charles O. McCreedy shall be paid the gross commission plus 40% of any expense or acquisition allowance payable in the event that an existing policy is converted by him to a "permanent" form of Insurance for which a higher premium is payable. Pursuant to the Mohawk agreement, petitioner acquired 402 accounts, 68 of which were *15 life accounts. On April 24, 1964, petitioner entered into an agreement with Albert Stone for the purchase of Stone's right, title and interest in his agency contract with the Federal Life and Casualty Company of Battle Creek, Michigan, with respect to life and health insurance in force as of May 1, 1964. The purchase price was $3,800. The pertinent part of the agreement reads as follows: AGREEMENT This agreement, made the 24th day of April, 1964, by and between Albert Stone of 152 Utica Street, Clinton, New York, having his office and principal place of business at 152 Utica Street, Clinton New York, hereinafter called the "Seller", and Meyer Morris, doing business at 1219 Granite Building, Rochester, New York, hereinafter called the "Buyer". WITNESSETH: WHEREAS, Seller is now engaged in business as a general Agent for the solicitation of Life and Accident and Health Insurance for the Federal Life and Casualty Company of Battle Creek, Michigan and WHEREAS Seller has agreed to sell to the Buyer all right, title and interest of Albert Stone in his Agency Contract with Federal Life and Casualty Company of Battle Creek, Michigan with respect to Life and Health Insurance which *16 has been produced under the terms of such contract to the good will which may have accrued and to the right to receive renewal commissions on business in force as the business renews after MAY 1st, 1964. WHEREAS, THE AFORESAID SALE IS subject to the following specific conditions: 1. Buyer shall pay to the Seller therefor, the sum of Three Thousand Eight Hundred ($3,800.00) upon execution of this agreement. 2. Seller agrees to turn over to the Buyer all records, cards, files and copies of correspondence pertaining to the aforesaid business. 3. Seller agrees that it will not, in relation to the aforesaid business, solicit, canvass or replace such business, or permit or allow or give any other person, firm, association or corporation the right to solicit, canvass or replace such business, except to the benefit of the Buyer, or unless by written mutual agreement of both parties. 4. Seller agrees that all Life and Accident and Health Insurance solicited or written by Albert Stone or by Mrs. Albert Stone will be first offered to the Federal Life and Casualty Company and placed through the Agency of the Buyer, for a period of not less than five (5) years from May 1st, 1964. Buyer *17 shall have the right to examine the production records of the agency now run by Albert Stone the Seller to ascertain compliance with this provision. 5. Buyer agrees to pay the Seller the customary producer's commission for any Accident and Health business produced by the Seller or by the Seller's wife, and in addition further agrees to pay the Seller or Seller's wife the customary first year commission on Life Insurance and the customary renewal commissions on this business written by them after May 1st, 1964. 6. Buyer agrees to pay Seller and Associates concerned the customary agents renewal commission for all new Accident and Health business written after June 1st, 1964, Provided the Seller continues to reside in the Utica, New York, area. 7. Buyer also agrees to pay any Associates of the Seller the customary renewal commissions on all Life Insurance business written after May 1st, 1964, for a period of time not exceeding nine (9) years from the date of issue from the time the business is placed on the books of the buyer, provided the Seller continues to reside in the Utica, New York, area. Pursuant to the Stone agreement, petitioner acquired 270 accounts, 133 of which were *18 life accounts. 1562 From the various accounts purchased by petitioner the following commissions were received: Rochester, N. Y. accounts purchased effective July 1, 1963
Commissions received prior year
$15,673.13
Commissions July/63-June/64
12,438.94
Commissions July/64-June/65
12,394.05
Commissions July/65-June/66
11,066.03
Commissions July/66-June/67
9,696.04
Commissions July/67-Mar/68 (9 mos.)
5,589.83
Schenectady, N. Y. accounts purchased effective August 1, 1963
Commissions received prior year
$6,011.33
Commissions Aug/63-July/64
4,153.59
Commissions Aug/64-July/65
4,142.32
Commissions Aug/65-July/66
3,621.61
Commissions Aug/66-July/67
3,187.22
Commissions Aug/67-Mar/68 (8 mos.)
1,619.54
Utica, N. Y. accounts purchased effective May 1, 1964
Commissions received prior year
$3,110.54
Commissions May/64-April/65
2,645.64
Commissions May/65-April/66
2,087.61
Commissions May/66-April/67
1,903.06
Commissions April/67-Mar/68 (11 mos.)
1,467.01
Petitioner obtained both new and referral business from the various customer lists he purchased. The contract price for each agreement was determined *19 by multiplying the value of the renewal commissions of the accounts purchased by a varying factor. For the Uhl contract the factor was 2.0, for the Mohawk contract it was 1.9, and for the Stone contract it was 1.2. Implicit in each of these factors were the covenants not to compete. Petitioner would not have entered into any of the agreements unless the contract contained a covenant not to compete. There was no discussion, bargaining or allocation of the purchase price to any of the covenants not to compete. Petitioner and the sellers were represented by counsel in connection with the Uhl and Mohawk contracts and were advised as to the provisions of the agreements. It is not known whether Albert Stone was represented by counsel in connection with the sale of his business. The underwriting companies took some action with respect to the continuation or renewal of some of the accounts. In his income tax returns for 1963 and 1964 petitioner claimed amortization deductions of $2,066 and $4,360.98, respectively, on the "insurance expirations." These were disallowed by respondent in his notice of deficiency because they represented "the purchase of goodwill or other intangibles having *20 an indeterminate useful life." By an amendment to his petition at the time of trial petitioner has claimed, alternatively, amortization deductions for the covenants not to compete. Opinion The first question we must decide is whether the petitioner is entitled to depreciation deductions in 1963 and 1964 with respect to the purchase of various life and health insurance businesses. Petitioner contends that he should be allowed to amortize the "renewal accounts" over a period of years. Respondent, on the other hand, argues that no allowance for depreciation should be accorded petitioner because the "property" received by him, i.e., the records, files, correspondence, contracts of policyholders and goodwill incident thereto, constitutes intangible assets with an indeterminable useful life. Section 167(a) (1) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business. Section 1.167(a)-3, Income Tax Regs. *21 , provides, in pertinent part, as follows: If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, inthe unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. The established principle in this Court is that where a taxpayer purchases a going general insurance agency business or a part thereof, including the goodwill, the list of insurance expirations and other intangible assets, the insurance expirations (renewal accounts) are either a part of goodwill, which is not subject to depreciation, or are so inextricably linked with goodwill as to have an indefinite useful life *22 and therefore not depreciable. See Alfred H. Thoms, 1563 50 T.C. 247 (1968); Marsh & Mc-Lennan, Inc., 51 T.C. No. 7 (October 16, 1968); and cf. Commissioner v. Killian, 314 F. 2d 852 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court. The facts herein clearly show that the petitioner bargained for and received more than mere rights to renewal commissions. Cf. H.B. Hill, 3 B.T.A. 761 (1926); Frances E. Latendresse, 26 T.C. 318 (1956), affd. 243 F. 2d 577 (C.A. 7, 1957), certiorari denied 355 U.S. 830. With regard to each purchase he bargained for and received a going insurance business or a portion of it with all its concomitant goodwill, files, records and what is commonly known as "insurance expirations." The precise provisions of the three agreements, set out in our findings of fact, so indicate. Thus, as we view it, this case is controlled by our recent opinion in Alfred H. Thoms, supra, where we said (pp. 252, 256): Petitioner had the burden of proving that the intangible asset he purchased, namely the list of expirations, had a limited and determinable useful *23 life in his business. Thrifticheck Service Corporation, 33 T.C. 1038, affd. 287 F. 2d 1, 3, 4 (C.A. 2, 1961). If it is the type of asset which has a continuing value in the business lasting until an indeterminate time in the future it is not subject to a depreciation allowance. The Danville Press, Inc., 1 B.T.A. 1171 (1925); National Weeklies v. Reynolds, 43 F. Supp. 554 (1942). * * * We are of the opinion that under the facts of this case the list of expirations is so inextricably linked with goodwill that it could not possibly have a separate depreciable existence. We have here the transfer of a going insurance agency business and its goodwill. Any definition of goodwill includes the concept of the advantage that the proprietor of an existing business enjoys resulting from the probabilities that old customers will continue their patronage. Surely goodwill in the insurance agency business encompasses the advantage that the agency has, that its policyholders will renew their expiring policies. It is difficult to see how any insurance agency could transfer its goodwill without delivering its insurance expiration list to the *24 transferee. If the list is not given to the transferee of goodwill he receives no benefit in the form of a probability that the policyholders of the old business will renew with him, which is just another way of saying he did not get the goodwill. If the list is delivered to the transferee of goodwill it merely accomplishes the transfer of the goodwill - defined to be the benefit that he will probably secure the renewals. The transfer of a list of expirations of a going insurance agency business is merely implementing the transfer of goodwill. W. Walley, Inc. v. Saks & Co., 41 N.Y.S. 2d 739. It is furnishing the transferee with records that will give him the opportunity to succeed to the advantageous position of his transferor. In our opinion the list of expirations is an integral part of the goodwill of a going insurance agency business. [Footnote omitted.] We attach no significance to the fact, stressed by petitioner, that the underwriting company can and does take action affecting the continuation of some of the renewal accounts. Accordingly, we hold that the petitioner has failed to prove that the intangible assets he purchased have a limited and determinable *25 useful life in his business. Consequently, no depreciation deduction is allowable. In the alternative petitioner contends that, if the cost of the renewal accounts and other intangibles acquired is not depreciable, some portion of each purchase price should be allocated to the noncompete covenant and amortization of such amount allowed over an unspecified period of time. We cannot agree. The applicable rule of law in cases where there is no allocation to a covenant not to compete in an agreement of sale is plainly stated in Annabelle Candy Co. v. Commissioner, 314 F. 2d 1, 8 (C.A. 9, 1962): Did the parties, not preliminarily, but when they signed this agreement, intend to allocate a portion of the purchase price to the covenant not to complete? The issue is entirely factual. While no particular fact is conclusive, there are several factors which tend to support our view that no consideration was paid, or intended to be paid, for the noncompete covenants. First, the agreements contained no allocations to the covenants. It has been held that the failure of the parties to *26 allocate in an agreement any part of the consideration to a noncompete covenant is "strong evidence" that no allocation was intended. Delsea Drive-In Theatres, Inc. v. Commissioner, 379 F. 2d 316 (C.A. 3, 1967), affirming a Memorandum Opinion of this Court; 1564 Rinehart Oil News Co. v. Commissioner, 369 F. 2d 692 (C.A. 5, 1966), affirming per curiam a Memorandum Opinion of this Court. Second, there is no evidence that in the negotiations the parties intended that any portions of the purchase prices should separately relate to the covenants. Cf. Grant T. Rudie, Jr., 49 T.C. 131 (1967); Benjamin Levinson, 45 T.C. 380 (1966). In other words, the noncompete covenants were not actually dealt with as separate items in the transactions. In each instance the inclusion of the covenant was made to protect the "insurance expirations" purchased. We think the function of the covenants herein was to assure the petitioner the beneficial enjoyment of the goodwill, including the insurance expirations, he obtained. They had no independent significance apart from assuring the effective transfer of such goodwill. See Alfred H. Thoms, supra *27 at p. 255; Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957); and Aaron Michaels, 12 T.C. 17 (1949). Petitioner cites John T. Fletcher, T.C. Memo. 1965-273, Grant T. Rudie, Jr., supra, and Eleanor M. Lutz, 45 T.C. 615, 629-635 (1966), reversed on another issue 396 F. 2d 412 (C.A. 9, 1968), as supporting a basis for us to allocate a portion of each purchase price to the covenant and allow amortization over a 10-year period. All three cases are distinguishable. Unlike Fletcher, where we had the benefit of the testimony of three expert witnesses that there was substantial value to the covenant not to compete, we have here the contracts and petitioner's admission that the covenants were not independently bargained for and that no value was assigned to them. See and compare B.T. Babbitt, Inc., 32 B.T.A. 693, 697 (1935). In the Rudie case, by contrast, the facts established that the covenant was "a principal asset of the purchase, was separately bargained for, and did, indeed, have independent significance." And in Lutz each of the four contracts *28 provided a specific allocation of the purchase price to the noncompete covenant and provided for liquidated damages in the event the seller breached the covenant. Accordingly, we conclude on this record that no portions of the purchase prices paid pursuant to the three agreements herein are allowable as depreciation of the noncompete covenants. Decision will be entered for the respondent. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩